SNYDER, APPELLANT, *v.* RIDGE HILL MEMORIAL PARK
ET AL., APPELLEES.

(Decided March 14, 1938.)

*Mr. O. D. Eshelman, Mr. E. H. Davidson* and *Messrs. Jesse & A. A. Stephens,* for appellant.

*Messrs. Glitsch, Stack & Moon* and *Mr. Wesley Grills,* for appellees.

LLOYD, J. Medora Snyder, plaintiff in the Court of Common Pleas, appeals to this court on questions of law and fact from a dismissal by that court of her amended petition and a judgment against her for costs.

The substantial facts disclosed by the evidence are as follows:

In September of 1928 the Ridge Hill Development Company, Inc. (hereinafter referred to as Development), was organized as a corporation for profit under the laws of Ohio, its purposes as expressed in its amended articles of incorporation being for:

"Leasing, buying, holding, owning and selling real estate and the doing of any and all manner of work necessary for the preparation and development of said real estate for memorial park purposes and also the construction and erection of buildings, mausoleums, burial vaults, tombs and monuments thereon; the acquiring by purchase, lease or otherwise of any and all real and personal property necessary or incident to the conduct of the said business, and the selling and developing of said memorial parks, and the selling, leasing or otherwise disposing of any or all of said real or personal property and the development and the doing of all things necessary or incident thereto."

In November, 1928, the Ridge Hill Memorial Park (hereinafter referred to as Association), an Ohio corporation not for profit, was organized, the charter purposes being:

"The leasing, buying, holding, owning and operating cemeteries and burial grounds; and the buying of any and all manner of work necessary for making and preparing said burial grounds; also the construction and erecting of buildings, mausoleums, tombs and monuments thereon; the acquiring by purchase, lease or otherwise, of any and all real and personal property necessary or incident to the conduct of the business of said cemetery and burial grounds, and the sale, leasing or otherwise disposing of any or all of said real or personal property, and the doing of all other things necessary or incident thereto."

The authorized capital stock of Development consisted of 4200 shares, of which 3600 are common stock

with a declared value of $5 each, and 600 shares of preferred of the par value of $100 each, with yearly dividends of 7 per cent.

Prior to the incorporation of either company, a Mr. Yeager, described by himself as "the man back of the program," acquired an option on 57 acres of farm land owned by a Mr. E. C. Straw, who became one of the incorporators of and a stockholder in Development. Then followed the organization of Development, the sale of approximately $40,000 of its stock and the assignment to it by Yeager of his option, followed by the incorporation of Association; the incorporation of both Development and Association being a part of the preconceived cemetery plan of Yeager. On November 20, 1928, Straw conveyed the optioned land to Development, for which he was to receive $15,000 in cash and a mortgage of $35,000 on the western portion thereof. This mortgage has been reduced to $29,-750. In the mortgage, according to Yeager, "is a release clause giving us the privilege of the sale of property for burial purposes."

On January 26, 1929, Development purchased 12 acres of land from Bertha Straw, paying therefor $10,-000 in cash, and on June 20, 1930, purchased from her for $900 in cash an additional one-quarter of an acre. On April 14, 1930, it purchased of Bertha, Gladys and Leon Straw, for $1830 in cash and a purchase money mortgage of $3,000, 24.15 more acres of adjoining land.

On November 15, 1928, Development conveyed to Association by quitclaim deed approximately 35 acres of its unencumbered land, which was described in the deed as being: Block "A" Lots Nos. 1 to 495 inclusive; Block "B" Lots Nos. 1 to 415 inclusive; Block "C" Lots Nos. 1 to 133 inclusive; Block "D" Lots Nos. 1 to 602 inclusive; Block "H" Lots Nos. 1 to 866 inclusive; Block "I" Lots Nos. 1 to 1200 inclusive; Block "L" Lots Nos. 1 to 238 inclusive; Block "P" Lots Nos. 1 to 178 inclusive; Block "Q" Lots Nos. 1 to 570 inclusive;

Block "T" Lots Nos. 1 to 462 inclusive; Block "U" Lots Nos. 1 to 127 inclusive; Willow Triangle, Lots Nos. 1 to 21 inclusive.

The plats, blueprints and photographs in evidence and the testimony of the witnesses show that the entire acreage acquired by Development was planned and designed as a unit, and, as Mr. Yeager testified, was acquired by Development for the sole purpose of sale to Association; and there is nothing in its appearance to indicate that any part of it is not under the control and ownership of Association. Anyone purchasing a lot therein would not, from a view thereof, be able to distinguish that held by Association from that retained by Development. The deeds of conveyance are not in evidence but from a blueprint it appears that the main entrance to the cemetery is the property of Development.

Burial spaces of the total sales value of $528,494 in the property aparted to Association have been sold, and there have also been some burials in that portion of the property not conveyed to Association. It was contemplated by Yeager that the sale of burial lots would equal $7,500,000, of which $750,000 would develop the cemetery, $750,000 would be in the perpetual care fund, and $375,000 be used to bring the cemetery to a self-sustaining condition — the balance of the money to go to Development; and that approximately $1,825,000 would be necessary for the expense, including agents incident to selling burial lots. "In order to pay out" the cemetery had to sell for $7,500,000. Yeager estimates "it will take approximately fifty years to accomplish all these things," but however long it may take, if his dreams come true, his Development will have received from the venture a profit of approximately $3,800,000.

To carry out the plan thus devised, a contract prepared at the instance of Mr. Yeager was executed by Association and Development. This contract is dated

and the amended petition alleges that it was executed on November 20, 1928. The amended answer of appellees alleges that it was entered into on November 15, 1928, "at the time of the execution and delivery of the quitclaim deed from" Development to Association.

The above referred to contract is as follows:

"Contract.

"This agreement made and entered into this 20th day of November, 1928, by and between Ridge Hill Development Company, Inc., a corporation, of Lorain, Ohio, party of the first part, and Ridge Hill Memorial Park, a corporation, of Lorain, Ohio, party of the second part, witnesseth:

"That, whereas, party of the first part is in the business of developing memorial parks for sale to cemetery associations, and

"Whereas, party of the second part is a cemetery association, and is desirous of purchasing from party of the first part burial lots in the property of party of the first part known as Ridge Hill Development Company, Inc., as the same is developed.

"Now, therefore, in consideration of the mutual promises herein contained, it is hereby agreed as follows:

"Party of the first part agrees that it will at its own expense develop and install all improvements in the premises known as Ridge Hill Memorial Park, and as the same is developed and improved, will sell to party of the second part, such lots as may be desired by party of the second part for a consideration of ninety per cent (90%) of the sales price received by party of the second part from the sale of said lots; said sums to be paid in full in cash upon the dates when conveyances of lots from party of the first part to party of the second part are made, or as demanded by party of the first part.

"It is understood by and between the parties hereto

that this contract shall be binding upon the parties hereto so long and until such time as all of the lots in Ridge Hill Memorial Park Cemetery have been disposed of by party of the second part.

"It is further understood and agreed by and between the parties hereto that the final ten percent (10%) collected on said lots shall be paid to a trust company designated by the parties hereto, the earnings of which shall be used for the perpetual upkeep and maintenance of Ridge Hill Memorial Park.

"In witness whereof, the parties hereto have hereunto set their hands to duplicates hereof the day and year first above written.

"Ridge Hill Development Company, Inc.,
"By Chas. F. Yeager, President,
"By P. H. Stevens, Secretary.
"In the presence of
"Ruth Firey,
"M. J. Firey.

"Ridge Hill Memorial Park,
"By C. F. Heitman, President,
"By M. L. Brandt, Secretary."

This contract was not made public, and the purchasers of burial lots were not advised of its existence or purport. Yeager testified that it was nobody's business except the trustees of Association and the directors, officers and stockholders of Development. "The lot owners," he said, "have no interest in it."

Association and Development occupy the same offices, Mr. Yeager being president of both, and a Miss Frank acting as secretary of both. Yeager has been manager of Development from its inception. Development employs agents to sell burial lots, and a prospective purchaser of a lot signs a contract with Association, wich is retained by Development, the deed therefor, when given, being executed by Association. The money, if paid in installments, passes through the

books of Association to Development, to apply on its
90 per cent interest therein and when paid in full, the
last 10 per cent is to go to Association as its portion
thereof under the contract. The same bookkeeper
keeps the books of both companies, and Mr. Yeager
signs all checks drawn by either of them. "The ceme-
tery property as it is sold, is paid for into the park as-
sociation and turned back by check to the development
company." At the first meeting of the board of trus-
tees of Association a resolution was passed at Mr.
Yeager's suggestion, providing for the investment in
preferred stock of Development of its contractually
entitled 10 per cent of the proceeds of burial lots, in
consideration of which Development "would shoulder
the responsibility of the maintenance and upkeep of
the cemetery and carry it on up to the time that the
earnings from that fund would be sufficient to take it
over." And so, from the very beginning of its operat-
ing activities, Development has had all of the proceeds
of sales of lots, Association having preferred stock of
Development as its share thereof, upon which one div-
idend of 7 per cent has been paid.

At the close of the fiscal year ending August 31, 1936,
the amount of the perpetual care fund approximated
$44,661 and the preferred stock deposited there-
for was $41,200, with which there was afterwards de-
posited an additional $5,000 of preferred stock. The
intention is to carry this perpetual care fund in pre-
ferred stock of Development for ten years, at which
time Mr. Yeager anticipates it will have accumulated
sufficiently to take over the upkeep of the Association
property, and according to the resolution, the fund is
then to be invested in government and municipal bonds.

Sometimes Association traded burial lots for pre-
ferred stock of Development "and carries that stock in
their perpetual care fund." For example, to quote Mr.
Yeager:

"In the event that this gentleman purchased say

$500 worth of preferred stock when we started our company, and later on decided he wanted a cemetery lot, we would accept the $500 of preferred stock in exchange for a cemetery lot, and then the trustees purchase the stock of the development company temporarily for the investment of the perpetual care fund.''

In other words, a stockholder of Development can trade his preferred stock to Association for burial lots. The owners of preferred stock have no voice in the election of officers or directors of Development. Yeager himself turned into Association $15,000 of preferred stock in exchange for cemetery lots, Association giving 90 per cent of the agreed value of the preferred stock to Development.

''If the cash is on hand, it will be paid over,'' otherwise it is ''just a matter of bookkeeping.'' All of the preferred stockholders of Development are privileged to exchange their stock for cemetery lots; ''credit one company and charge the other * * *. The memorial park association owes the development company approximately $70,000 in accounts receivable''; representing amounts owing by purchasers of burial lots, 90 per cent of which, when paid, goes to Development. Of the authorized $60,000 of preferred stock of Development, Association now has $46,200 thereof. Of the remaining $13,800 thereof, Yeager owns 30 shares and the remainder is owned by others interested in Development, and they, at least some of them, have taken cemetery lots for preferred stock. The evidence also shows that those thus buying cemetery lots with preferred stock have traded lots thus bought for privately owned real estate. Some of the real estate is located in Lorain and Elyria, and one, a lot in Akron ''opposite the Goodyear Tire & Rubber,'' was purchased by Development for $15,000 in value of cemetery lots. Development also owns four lots in Vermilion, ''the Flatiron Building'' in Lorain and at one time, a farm near Sharon, Pennsylvania. This farm

has been sold, Development receiving 90 per cent of the sale price, the other 10 per cent being credited to the perpetual care fund. "Not a dollar" in cash is or ever was in the "perpetual care fund." It was all in preferred stock of Development.

Of the original 3600 shares of common stock of Development, "I," quoting Yeager, "purchased 2400 shares of the 3600 that was [sic] authorized and turned a portion of my salary—which was agreed upon by the board of directors—over for the payment of the 2400 shares." His salary for the first four years was $12,000 in cash and $3,000 paid on the common stock. "However, I did not take it all out in cash. I took cemetery lots for the major portion of that $12,000. * * * From 1929 to 1936 I took out $49,200 in cemetery property in lieu of cash." In addition to all this, he has a contract with Development for sales, originally on a 15 per cent basis, which, as "conditions grew less lucrative" was increased to 30 per cent. "Out of that I have to pay the sales people, * * * my earnings from commission sales would be somewhere in the neighborhood of $25,000 to $30,000 in excess of what I have paid out." There are approximately 750 grave spaces to the acre, for which the "minimum price today is $15 per grave space" and the average maximum, $50. "Burying 750 to the acre, it would be about $37,500 an acre." The Association has nothing to do with the landscaping. That is directed by Mr. and Mrs. Yeager. Nor has the Association any control over the development of the land for burial purposes. "The construction part is entirely up to the development company." Development makes a charge for opening and closing graves and keeps the money. It also sells vases, bronze plates and shrubbery. If a "plate" is purchased of some one else, "a fee of $15 for the perpetual care fund" must be paid "in order to put that plate in the park." As collateral security for the preferred stock held by Association in lieu of its 10 per cent part of

sales, it holds $100,000 of Development's property measured by its burial lot sale price—Development by resolution of its board of directors having "relinquished their claims to the 90 per cent thereof."

This question was asked of the witness Yeager:

"Other than electing a board of trustees, filing the application for exemption; filing the plat of the property and its division into burial spaces; executing the deeds, accepting the applications, and paying over 90 per cent—which is done by bookkeeping—what else does the cemetery association do?"

The answer was:

"Well, they have their annual meeting every year and elect their board of trustees and review the operations of the cemetery association."

If a lot is forfeited, or the contract therefor cancelled because of non-payment of the balance of the purchase price, the amount paid thereon is retained by Development for "sales expense and overhead." Association receives or is credited with only 10 per cent of the sales that are fully consummated; that is, of final sales of repossessed lots fully paid for. Money received from sales is deposited in the bank account of Association and all of it "as it comes in * * * is turned over to development company."

Catherine Frank, who owned five shares of the common stock of Development, apparently transferred to her by or through the directions of Mr. Yeager, and who was the secretary of both Association and Development, testified as follows:

"Q. The fact of the matter is, Mr. Yeager supervises all of the transactions of either the association or the company, doesn't he? A. Well, I don't know.

"Q. There isn't anybody else there to do it, is there? A. Mr. Yeager is the man in charge; he is the general manager.

"Q. And he is in charge of the affairs of the association, isn't he? A. Yes, as president.

"Q. You take your instructions with reference to the affairs of the association from him? A. Mr. Yeager.

"Q. That is right, isn't it? A. Yes.

"Q. Do you draw any salary from the cemetery association? A. Nothing.

"Q. You just receive a salary from the development company? A. Just from the development company.

"Q. Just what does the association do there except sign the deeds, take in the application for the sale of lots, and turn over the money after it has come in to the development company? Do they do anything else that you know of? A. Other than what did you say, other than signing deeds?

"Q. They sign the deed when they sell lots, don't they? A. Uh-huh.

"Q. You sign them and Mr. Yeager signs the deeds, don't you? A. Yes.

"Q. And when the application comes in for the sale of the lots, you receive that, don't you? A. Yes, sir.

"Q. And the money comes in, you receive that? A. Yes.

"Q. And put it in the bank and turn the money over to the development company? A. Yes, sir.

"Q. Now, outside of that, there is nothing that the cemetery association does, is there? A. I don't know of anything else.

"Q. If somebody comes in and wants a grave opened why, that is the development company's business? A. Yes, sir.

"Q. If you are making some improvements, or hiring a man to take care of the cemetery, that is the development company's business? A. Yes, sir.

"Q. Now there is a vault account. What is that vault account? A. In the development company.

"Q. In other words, if I want to bury in that cemetery, the development company sells me a cemetery vault? A. We have done that.

"Q. And they charge me for it? A. Yes.

"Q. And the association has nothing to do with that?
A. No, sir.

"Q. If I want to put markers around my grave, that
is a matter for the development company, isn't it? A.
It is.

"Q. If I want to put flowers or a vase on the grave,
that is a matter purely for the development company;
I pay them, don't I? A. Yes, you pay them for the
vases.

"Q. And is there any assessment made against the
lot owners for the upkeep of the graves? A. No, sir,
only their 10 per cent that is taken out when the sale is
made to take care of their lot."

An exhibit designated "Salary and Commission Account of Charles F. Yeager" for the fiscal year ending
August 31, 1929, to August, 1936, inclusive, shows:

"Salary credits, 1929-30-31-32;
    4 years @ $15,000 per year  $60,000.00
"Salary credits, 1933-34-35-36;
    4 years @ $10,000 per year  40,000.00
"Commission credits; 8 years,
    1929 to 1936 inclusive. . . . .  42,669.00

    "Total Salary and Commission credits for 8
    years . . . . . . . . . . . . . .$142,669.00
"Cash drawn 8 years, 1929 to
    1936 inclusive . . . . . . . . . . .  60,134.23
"Preferred stock as of August
    31, 1936 . . . . . . . . . . . . . . . .  8,000.00
"Common stock, as of August
    31, 1936 . . . . . . . . . . . . . . . .  14,825.00
"Cemetery property . . . . . . . .  49,200.00
"Rent, gasoline and Misc.
    Charges—8 years . . . . . . . .  8,154.19  $140,313.42

"August 31, 1936, credit balance due CFY. . . . . . . . . . . . . . . . . . . .  $2,355.58"

In the record is other evidence of like tenor and effect but the foregoing narration of facts is sufficient to tell the story of these two corporations.

The appellant, Medora Snyder, as the owner by inheritance of a lot in the association-held portion of the cemetery, purchased by her mother who is now buried in one of the grave spaces therein, commenced an action in the Court of Common Pleas, specifically enumerating in her amended petition filed therein the relief to which she claims to be entitled, among which are the quieting of the title of Association to its property, an accounting and the appointment of a receiver with full power and authority to collect and receive all moneys and claims due or to become due and owing Association, and especially from Development, and to hold the same until the further order of the court, with full power and authority to operate said Memorial Park Cemetery in accordance with law and the orders of the court and for such other and further relief as in equity may be proper. The appellant alleges that the action is brought not only in her own behalf but for and on behalf of all other lot owners, numbering in excess of 2,000.

The evidence discloses and the answer admits that a large number of burial lots have been sold and are now owned by various persons. As said at page 478 of *Close* v. *Glenwood Cemetery,* 107 U. S., 466, 27 L. Ed., 408, 2 S. Ct., 267:

" 'This was not to be a mere graveyard in which each lot-holder acquired a piece of ground in which to bury his dead, and at the same time become chargeable with the sole care of his particular lot; but the lot-holders themselves became subject to by-laws and regulations having reference to the institution as an entirety, and the perpetual preservation of the cemetery as an ornamental and convenient place for interment and for resort by the relatives of the dead.' "

Appellant having an interest in the cemetery as an

entirety, is entitled to have it conducted in conformity with its charter purposes and the statutes of the state pertaining thereto; and if need be, is entitled to bring and maintain an action to obtain that result; and her remedy must be a suit in equity, an action at law being inadequate to protect her interest therein in accordance with the statutes creating it.

Having challenged the legality of the method pursued in the instant case, this court is to determine *de novo* from the evidence whether the procedure adopted and the contract upon which it is based are countenanced and protected by the laws of this state.

Section 8623-3, General Code, provides that:

"* * * where the General Code makes special provision for the filing of articles of incorporation of designated classes of corporations, such corporations shall be formed under such provisions and not hereunder."

Prior to its enactment in its present form, the only limitation contained in Section 8623, General Code, read:

"Except for carrying on professional business, a corporation may be formed for any purpose for which natural persons lawfully may associate themselves."

Section 8623-97, General Code, provides:

"* * * that where the General Code makes special provision for the filing of articles of incorporation of designated classes of corporations not for profit, such corporations shall be formed under such provisions and not hereunder."

Section 10093 *et seq.* (of Title IX, Division VI, Chapter 7), General Code, relate to the privileges granted and limitations imposed upon a company or association chartered for cemetery purposes.

Whether an Ohio corporation incorporated for profit can acquire, develop and use land for and as a cemetery, we are not here concerned, but a comparison of the articles of incorporation of Association and Development shows that each of them is incorporated for

cemetery purposes, the one to provide and prepare, the other to maintain and perpetuate a place for burials of the human dead. By conveying to Association the land acquired solely for cemetery purposes, after it had been prepared and made ready for those purposes, Development seeks by indirection to profit from that which the law says shall not be the subject of profit; an attempt to enter by a rear door when the front door is closed and securely bolted.

To pass for the moment the avowed intent to avoid the spirit of the applicable statutory provisions and the public policy they invoke, what is the nature and effect of the executed contract, the validity of which is questioned? It provides as a consideration that Association desires to purchase "burial lots" in the property of Development and that upon that premise Development will, at its expense, develop and install all improvements in the property known as "Ridge Hill Memorial Park" (referring evidently to the property acquired or to be acquired by Development) and, as the same is developed and improved, will sell to Association such lots as the latter may desire, for 90 per cent of the sales prices received by Association from the sale of such lots, the contract to be binding upon the respective parties "so long and until such time" as all of the lots in Ridge Hill Memorial Park Cemetery (referring again, it would seem, to the property owned or to be acquired by Development that has or may from time to time be conveyed to Association) have been disposed of by Association; the final 10 per cent collected on said lots to be paid to a trust company designated by the parties, the earnings therefrom to be used for the perpetual upkeep of Association. This contract does not specify the particular lot or lots to be conveyed, whether one or thousands, whether one or more acres. It takes away from Association control of the planning and development of the land for its intended purposes, Development retaining for itself as

a commercial proposition everything that relates to the creation and care of a cemetery as provided and contemplated by the statutory provisions relating thereto. How long is the contract to continue? Other than that it shall be binding until all of the lots in Ridge Hill Memorial Park Cemetery shall have been disposed of by Association, and presumably paid for on the 90-10 per cent basis, it does not say. It may continue for a year or for many years—at least fifty, Yeager thinks it will require. It does not say how many lots are to be conveyed. It does say that the "90 per cent of the sales price is to be paid in full in cash upon the dates when conveyances of lots from" Development to Association "are made, or as demanded" by Development. Literally, this means that Development will convey lots to Association when and only when Association has a purchaser therefor.

What is to prevent Development, if the sale of burial lots ceases to be lucrative, to breach its contract and say "we are through"; and should it at any time do so, what then becomes of Association and the interest of the lot holders therein? Development has not only the 90 per cent but also the remaining 10 per cent of the money collected. Under such circumstances, what remedy would accrue to Association—specific performance, if appropriate, to continue the existing regime— an action for damages with a consequent judgment lien on the land then owned by Development—a second judgment lien on the mortgaged portion thereof and subject maybe to other liens that may have accrued? The fact that Association holds part of the unencumbered land of Development as collateral security for its investment in preferred stock of Development of its 10 per cent share of the gross profits of the business would not materially affect the situation. Is it possible that any one will claim that such a contract is binding upon an Ohio non-profit cemetery association?

Without further comment, the members of this court are of the unanimous opinion that the contract is not only so wanting in mutuality and so uncertain and indefinite in its terms as to be invalid, but also, and more important, it is *ultra vires*. Not only is it still an executory contract, but it is unmoral, in concept. As we already have said, it seeks to divest Association of all of its statutory powers and by circumlocution to avoid its limitations; to do by indirection and subterfuge what can not be accomplished directly. Obviously, the General Assembly, mindful of the uses and purposes to which dedicated, and as a declaration of public policy, enacted the several statutes relating thereto so that cemeteries organized thereunder would be free from commercial exploitation and speculation.

Association, by its incorporation, devoted whatever property it thereafter acquired, to public as well as private use. *Bd. of Edn. of City of Akron* v. *Proprietors of Akron Rural Cemetery*, 110 Ohio St., 430, 436, 144 N. E., 113; *Wolford* v. *Crystal Lake Cemetery Assn.*, 54 Minn., 440, 56 N. W., 56. Assuredly a corporation thus organized and dedicated to public use, and because of that public use and necessity exempt from taxation, execution or levy, and given the power under certain circumstances to appropriate land of others for its lawful purposes, can not delegate its powers and duties to another corporation organized for like or other purposes. Manifestly such a contract would be void as against public policy, not only because violative of the statutes under which Association was incorporated, but because injurious to the public use to which it is dedicated.

"What is the meaning of 'public policy?' * * * In substance it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare and the like. It is that general and well-settled public opinion re-

lating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation. * * *

"When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court.

"It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy.

"Public policy is the cornerstone—the foundation— of all constitutions, statutes and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on a matter of public policy? There was no precedent for it, else it would not have been the first." *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Kinney*, 95 Ohio St., 64, 67, 115 N. E., 505, L. R. A. 1917D, 641, Ann. Cas. 1918B, 286.

In the instant case, Association, through the urge of those in control of both it and Development, sought to enter into a contract the purpose of which was profit to the promoters thereof. The land purchased for cemetery purposes—that conveyed to the Association as well as that retained by Development—was planned and developed as an entirety, and was presented to

public view as such. The contract was not publicized, and so far as the purchasers of burial lots were concerned, was not disclosed, and to that extent was impliedly deceitful and fraudulent. The whole arrangement was not only unlawful but shocking to the sentiments and conscience of the average man. What little money Association was to receive under the contract was returned to Development for preferred stock, an investment upon which one dividend ostensibly paid was also retained by Development. The undisputed facts alone are sufficient, without analytical discussion, to stamp the whole arrangement as fraudulent. As said in *Brown* v. *Maplewood Cemetery Assn.*, 85 Minn., 498, 89 N. W., 872:

"A cemetery association, having sold lots as burial places, which have been appropriated for that purpose, is a trustee for the benefit of those who lawfully make use of such lots, and is in duty bound to account to its beneficiaries—the lot owners—for moneys received therefrom."

As aptly expressing the mental reaction of the members of this court to what the promoters, of the scheme outlined, sought to accomplish, we quote as follows from the opinion of the court in the last above-cited case, wherein we find the applicable statutory provisions to be similar to those of Ohio:

"We had not supposed that public burial places had become in this state the subject of irresponsible speculation and profit, or that, under legislative authority, a corporate entity might be established through which land could be secured for a small price, to be devoted to cemetery purposes, whereby its value would be greatly enhanced, and thus secure to the promoters of the scheme the entire usufruct, without personal investment, contribution, risk or accountability. Unless we misapprehend the enlightened public sentiment which has largely made the mortuary law in this country the fierce race for wealth, even in this commercial

age, restrains its trafficking hands at the portals of the grave. That this is the general view, we have no doubt. At the supreme moment when friends or relatives pass from earth, the bereaved, upon whom the duty of providing decent Christian interment for the deceased is imposed, seldom inquire into the title of the place accepted for that purpose, or engage in a careful examination of articles of incorporation, but rely with confidence upon the kind attributes and generous impulses of their fellow men in furnishing a sepulture for the repose of their dead, which may be ornamented by those memorials of affection through which it is sought to assuage 'the grief within that passeth outward show.' In view of the reverence which is universally attached to the place where the ashes of our dead repose, the claims of respondents raise this appeal into a matter of more than usual importance, and it behooves us to seriously and patiently examine the legal grounds upon which they are based; for, if of substantial force, it must be of the greatest moment to those whose bereavements subject them to the questionable consideration of speculators in burial lots.''

Our conclusion therefore is that the contract in question is invalid and void and should be cancelled and Development be enjoined from further proceeding thereunder, and a decree so finding will be entered. This, being the basis of such further orders, decree or judgment as may be incidental and necessary thereto, would seem to be a final order from which an appeal may be taken to the Supreme Court; and if it should be there decided that our conclusion is wrong, no additional expense would be imposed upon the parties hereto. The execution of the decree herein will therefore be suspended for thirty days, so that the appellees may have an opportunity to so proceed. The jurisdiction of the cause in other respects will be retained by this court for such further orders, decree or judgment as may follow and be necessary and incidental to the

decree herein entered or for remander thereof to the Court of Common Pleas for such purposes. In the interim and until the further order of the court, Development is ordered to pay to Association any and all moneys hereafter received by it from the sale of burial lots, and Association is enjoined from paying to Development any money received by it from the sale of such lots; Development being further hereby ordered to pay to Association from any funds now in its possession, such additional sums, if any, as may be incidental and necessary to the operation by Association of the cemetery property held and owned by it; and the other appellees herein, until the further order of the court, are severally enjoined from paying to Development any moneys, or delivering or conveying to it any property, in the possession of any of them belonging to Development, or in which it has or claims any interest.

*Decree accordingly.*

CARPENTER and OVERMER, JJ., concur.

LLOYD, CARPENTER and OVERMYER, JJ., of the Sixth Appellate District, sitting by designation in the Ninth Appellate District.