### 32887. STRICKLAND v. GULF LIFE INSURANCE COMPANY.

UNDERCOFLER, Presiding Justice.

This is a certiorari. *Strickland v. Gulf Life Ins. Co.,* 143 Ga. App. 67 (237 SE2d 530) (1977). It involves a life-accident policy issued in 1946 which, among other things, insures against the loss of a leg. The policy provides coverage if within 90 days of the injury there is "dismemberment by severance." Strickland injured his right lower leg. Medical efforts to save the leg continued for 118 days. They proved unsuccessful and the leg was amputated. Gulf Life denied coverage because severance of the leg was beyond the 90 day limitation. The trial court granted Gulf Life's motion for summary judgment. The Court of Appeals affirmed. We reverse in order that the trial court may consider in the light of this opinion Strickland's pleadings that the condition requiring

severance within 90 days is contrary to public policy.

The Court of Appeals, in considering Strickland's appeal from the trial court's grant of summary judgment in favor of the insurance company, relied on our case of *State Farm Mut. Auto. Ins. Co. v. Sewell,* 223 Ga. 31 (153 SE2d 432) (1967), which it had reluctantly followed earlier in *Travelers Ins. Co. v. Pratt,* 130 Ga. App. 331 (203 SE2d 302) (1973) and *Boyes v. Continental Ins. Co.,* 139 Ga. App. 609 (229 SE2d 75) (1976).

In *Sewell* and *Boyes,* the issue was whether the loss incurred was the loss covered by the policy. The plaintiff in *Sewell* had suffered partial loss of his vision; he could make out images and colors and retained some peripheral vision. The Court of Appeals, in *State Farm Mut. Ins. Co. v. Sewell,* 114 Ga. App. 331 (151 SE2d 231) (1966), and in *Ga. Life &c. Ins. Co. v. Sewell,* 113 Ga. App. 443 (148 SE2d 447) (1966), construed the policy language,"the irrecoverable loss of the entire sight" as meaning a loss of sight "for all practical purposes" and affirmed such a charge given in the trial court. This court reversed, holding that the word "entire" had to be construed as meaning entire.

Similarly in *Boyes,* supra, the Court of Appeals, following *Sewell,* 223 Ga., supra, held that the total loss of use of the plaintiff's left arm was not covered by an insurance policy covering only a loss of a member by severance. This court denied certiorari.

A time limitation, as is involved in the case now before us, was presented to the Court of Appeals in *Pratt,* supra. The plaintiff's left foot had been injured in a hunting accident, but was not amputated for eighteen months. During this time he was under constant treatment to avoid the amputation. Although the leg as originally injured was completely useless, there remained the possibility that regeneration might occur. It did not, and amputation was eventually necessary. The policy covered a loss by severance within 90 days of the injury. At that point, the plaintiff's leg was still in a cast. The Court of Appeals, relying on *Sewell,* 223 Ga., supra, held that, since the policy required severance within 90 days, rather than merely loss of use during that time, the insurance company was not liable for the loss. Certiorari

was denied by a divided court.

The plaintiff raised the public policy argument regarding the time limitation now before us in *Pratt,* but the Court of Appeals denied the challenge on the authority of *Randall v. State Mut. Ins. Co.,* 112 Ga. App. 268 (145 SE2d 41) (1965) (death not within 90 days), *Metropolitan Life Ins. Co. v. Jackson,* 79 Ga. App. 263 (53 SE2d 378) (1949) (loss of sight not within 90 days) and *Bennett v. Life & Cas. Ins. Co.,* 60 Ga. App. 228 (3 SE2d 794) (1939) (death not within 30 days). In all of these cases, the Court of Appeals had held that time limitations in an insurance policy were "valid." This court has not directly ruled on this issue. However, "[s]tandardized contracts such as insurance policies, drafted by powerful commercial units and put before individuals on the 'accept this or get nothing' basis, are carefully scrutinized by the courts for the purpose of avoiding enforcement of 'unconscionable' clauses." 6A Corbin, Contracts § 1376, p. 21.

Where loss of a limb is involved at an arbitrary point in time, here 90 days, the insured under these cases is confronted with the ugly choice whether to continue treatment and retain hope of regaining the use of his leg or to amputate his leg in order to be eligible for insurance benefits which he would forgo if amputation became necessary at a later time. We find an insurance limitation forcing such a gruesome choice may be unreasonable and thus may be void as against public policy.

Finding such a limitation unreasonable is not without precedent. In Burne v. Franklin Life Ins. Co., 451 Pa. 218 (301 A2d 799, 801) (1973), a pedestrian had been struck by an automobile and had lain in a vegetative state for 4 1/2 years. The insurance company paid the life policy, but refused to pay the double indemnity accidental death benefits which were "payable only if '. . . such death occurred . . . within ninety days from the date of the accident.' "

As stated in Burne, 301 A2d 799, supra, at pp. 801-802 (footnote omitted), "[t]here are strong public policy reasons which militate against the enforceability of the ninety day limitation. The provision has its origins at a much earlier stage of medicine. Accordingly, the leading

[Pennsylvania] case construing the provision predates three decades of progress in the field of curative medicine. Advancements made during that period have enabled the medical profession to become startlingly adept at delaying death for indeterminate periods. Physicians and surgeons now stand at the very citadel of death, possessing the awesome responsibility of sometimes deciding whether and what measure should be used to prolong, even though momentarily, an individual's life. The legal and ethical issues attending such deliberations are gravely complex.

"The result reached by the trial court presents a gruesome paradox indeed—it would permit double indemnity recovery for the death of an accident victim who dies instantly or within ninety days of an accident, but would deny such recovery for the death of an accident victim who endures the agony of prolonged illness, suffers longer, and necessitates greater expense by his family in hopes of sustaining life even momentarily beyond the ninety day period. To predicate liability under a life insurance policy upon death occurring only on or prior to a specific date, while denying policy recovery if death occurs after that fixed date, offends the basic concepts and fundamental objectives of life insurance and [is] contrary to public policy. Hence, the ninety day limitation is unenforceable.

"All must recognize the mental anguish that quite naturally accompanies these tragic occurrences. Surely that anguish ought not to be aggravated in cases of this kind with concerns of whether the moment of death permits or defeats the double indemnity claim. So too, the decisions as to what medical treatment should be accorded an accident victim should be unhampered by considerations which might have a tendency to encourage something less than the maximum medical care on penalty of financial loss if such care succeeds in extending life beyond the 90th day. All such factors should, wherever possible, be removed from the antiseptic halls of the hospital. Rejection of the arbitrary ninety day provision does exactly that."

The New Jersey court has also found this reasoning persuasive. "The rule in almost every jurisdiction which

has considered the question is that the time limitations set forth in the policy are controlling and that recovery must be denied in a case such as the present one. See Appleman, Insurance Law and Practice (2d Ed. 1963), § 612. However, a recent decision by the Supreme Court of Pennsylvania has held that such time limitations are unenforceable and has allowed recovery where death by accident occurred well after the period stipulated in the policy. [Cit. omitted.] Although it is presently very much a minority rule, I am persuaded that the rule announced in Burne is the better rule and should be followed." Karl v. New York Life Ins. Co., 139 N. J. Super. 318 (353 A2d 564, 565) (1976). The court thus allowed the beneficiary of a man who had sustained a skull injury in a criminal assault to recover under the accidental double indemnity provisions in his two policies, which contained 90 and 120 day limitations, even though he died 11 months after the assault.

We note further that in Karl, supra, the court considered the question whether with the minimal cost[1] of the accidental death benefit, it would be unfair to the insurance company to ignore these time limitations in light of the company's economic risk calculations. It concluded, however, that the real purpose of the time limitation was to limit disputes concerning the causal connection between the death and the accident rather than because of any economic relationship between the premium and the time limitation. Also, the court observed that the reason the cost of accidental death policies was so low was that relatively few deaths occur because of accidents.[2]

In INA Insurance Co. v. Commonwealth Ins. Dept., 376 A2d 670 (Pa. Cmwlth. 1977), the insurance company also argued that the causation problem was the main

[1] In the case before us, Strickland has already paid more in premiums than the face amount of the policy.

[2] In the opinion, the court quotes that only 6.17% of all deaths in the United States in 1967 resulted from accidents. Karl v. New York Life Insurance Co., supra, p. 569.

reason for these time limitations. That court rejected the argument, observing that the burden was on the claimant[3] to establish the causative relationship, and held that causation was not a weighty enough problem to deny benefits arbitrarily to those surviving beyond the time limitation set out in the policy, but who had died as a result of the accident. Following Burne, the court upheld the insurance commissioner's ruling[4] that all similar time limitations in accident policies are arbitrary and unreasonable and thus against public policy.

"[I]t may be pointed out that 'liberty of contract' as that term is used by its admirers includes two very different elements. These are the privilege of doing the acts constituting the transaction and the power to make it legally operative. One does not have 'liberty of contract' unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it for him after it is made.

"This is the 'liberty of contract' that has so often been extolled as one of the great boons of modern democratic civilization, as one of the principal causes of prosperity and comfort. And yet the very fact that a chapter on 'legality' of contract must be written shows that we have never had and never shall have unlimited liberty of contract, either in its phase of societal forbearance or in its phase of societal enforcement. There are many contract transactions that are definitely forbidden by the law, forbidden under pains and penalties assessed for crime and tort; and there are many more such transactions that

---

[3] The court established a clear and convincing standard for proving causation where the death occurs after the time limitation in the policy.

[4] We note that in the Georgia Insurance Code (Code Ann. Ch. 56), the legislature mandates that "[t]he Commissioner shall disapprove any such form [contract] ... (5) if it contains provisions which are *unfair or inequitable or contrary to the public policy of this State,* or would, because such provisions are unclear or deceptively worded, encourage misrepresentation." Code Ann. § 56-2411. (Emphasis supplied.)

are denied judicial enforcement, even though their makers are not subjected to affirmative pains and penalties." 6A Corbin, Contracts § 1376, p. 20.

Corbin, in his treatise on contracts, also observes that the declaration of public policy is the proper function of the courts, as well as of the legislature. "Constitutions and statutes are declarations of public policy by bodies of men authorized to legislate. It is the function of the courts to interpret and apply these, so far as they go and so far as they are understandable. Some judges have thought that they must look solely to constitutions and statutes and to earlier decisions interpreting and applying them as the sources from which they may determine what public policy requires. This is far from true, even though these are the sources that are first to be considered and that often may be conclusive. [5]

" . . .

"In determining what public policy requires, there is no limit whatever to the 'sources' to which the court is permitted to go; and there is no limit to the 'evidence' that the court may cause to be produced, . . ." 6A Corbin, Contracts, § 1375, pp. 15-19. Then, the validity of the contract in question is one of law for the court.[6] 17A CJS 1238, Contracts, § 615.

---

[5] " 'Public policy is the cornerstone—the foundation of all Constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.' Pittsburgh, C. C. & St. L. R. Co. v. Kinney, 115 NE 505, 507, 95 Ohio St. 64, 67, quoted and applied in Snyder v. Ridge Hill Memorial Park, 22 NE2d 559, 61 Ohio App. 271 (1938)." 6A Corbin, Contracts, § 1375, p. 15, n. 12. (Footnote in original).

[6] "When the validity of a contract is in issue before a court, the judge is obliged to make decision whatever the degree of his ignorance or wisdom. Before decision there should be some debate and much evidence; afterwards the decision is subject to criticism, by litigant and lawyer, by

Although we are impressed by the persuasive reasoning of the above authorities, we do not here reach the question of law whether all such policy limitations are void as against public policy, nor indeed whether the 90 day severance clause before us is unenforceable. The trial court granted summary judgment in favor of the insurance company on the authority of *Sewell, Pratt,* and *Boyes,* supra, and on the basis of the pleadings, the contract of insurance and a stipulation of fact by counsel. The stipulated facts included only the date Strickland had been injured and the date over 90 days later that his right lower leg had been amputated, naming the doctor and place of the amputation. No evidence was produced on the issue, raised in Strickland's pleadings, that the contract was unreasonable, and thus void as against public policy. We are reluctant to make such an important pronouncement without further evidence. For example, medical evidence reported in Reliance Ins. Co. v. Kinman, 483 SW2d 166 (Ark. 1972), that it takes about 18 months for bone and nerve tissue to regenerate would be relevant to the reasonableness of the 90 day clause in this insurance policy. Other information important to the court's decision may include, for example, (1) the present state of medical science on rehabilitation of injured limbs; (2) whether the insured had a choice of other policies with

---

juryman and jurist, by the learner and the scholar. It is thus that the mores, the considered notions as to what makes for human welfare and survival are formed, to be constantly verified or altered in new cases, forever hammered on the anvil of life experience.

"The court can not postpone decision until all possible evidence is in. Sometimes the judge may properly take 'judicial notice' of what is common knowledge and generally held opinion. But it is never wise to jump to a conclusion or to disregard experience; and it is never necessary to decide an issue as to public policy without expert briefing of former decisions and without listening to the testimony of those whose interests are at stake and of disinterested and experienced observers." 6A Corbin, Contracts § 1375, pp. 10-11. (Footnotes omitted).

other time limitations; (3) whether the time limitation is related to the economic risk of the insurance company and (4) whether there is a relationship between the time limitation and the difficulty of proving causation.

We reverse the Court of Appeals in order that the trial court may fully consider the public policy issue.

*Judgment reversed. Nichols, C. J., Hill, J., and Judge G. Ernest Tidwell, concur. Hall, J., concurs in the judgment only. Jordan and Bowles, JJ., dissent. Marshall, J., disqualified.*

ARGUED NOVEMBER 14, 1977 — DECIDED FEBRUARY 14, 1978.

*Kunes, Kunes & Fleming, G. Gerald Kunes,* for appellant.

*Reinhardt, Whitley & Sims, Glenn Whitley,* for appellee.

BOWLES, Justice, dissenting.

As I read the opinion of the majority, I find only one conclusion reached—that the opinion of the Court of Appeals is reversed so that the matter may be referred back to the trial court to hear evidence, and *"fully consider"* the public policy issue.

Heretofore in Georgia, where the contract is unambiguous, our courts have been able to decide, without the benefit of evidentiary hearings, whether or not a given contract or clause in a given contract violates the public policy of this state. While I do not contend that it is impermissible for a trial judge to hear evidence to aid him in making such a decision, I conclude that the trial judge in this case made his determination based on his experience, common sense, general knowledge prevailing in his community regarding the habits and customs of his people, and prior decisions of our courts touching the question. He was not required by law to hear evidence.

Now, for the first time, we require the trial judge to receive or hear evidence on whether a given contract clause violates public policy. Having done so, he can again use his experience, common sense and general knowledge, and can again consider prior case law in

making a determination as to whether or not the 90 day contract clause in question violates the public policy of this state. Thus, we are forcing him to do what he did not consider necessary in the first instance, in addition to his customary procedure.

The majority opinion does not specifically overrule *Travelers Ins. Co. v. Pratt,* 130 Ga. App. 331 (203 SE2d 302), which has heretofore decided the exact question contra to this position. But to support their argument the majority quotes approvingly from two decisions in other states representing the minority view in America and which are without precedent. The majority says, "An insurance limitation forcing such a gruesome choice may be unreasonable and thus may be void as against public policy." It also castigates "powerful commercial units" and suggests that the policy of insurance offered in this case may have been offered to the insured on an "accept this or get nothing basis."

The fundamental right of our citizens to legally contract; the fact that the right to contract is paramount public policy of our state and should not be interfered with lightly[1]; and the fact that our appellate courts have heretofore ruled on the exact question one time, and similar questions many times, are disregarded. Unless there is some compelling reason to do so, we do the citizens of Georgia, the practicing lawyers and the lower courts an injustice when we attempt to overrule precedent without justification. I find no compelling reason, in this case, to deviate from the precedent laid down by this court in earlier cases.

I would affirm the opinion of the Court of Appeals without further ado.

I am authorized to state that Justice Jordan joins in this dissent.

---

[1] *Greenwood Cemetery v. Travelers Ind. Co.,* 238 Ga. 313 (23 SE2d 910) (1977); *Equitable Loan &c. Co. v. Waring,* 117 Ga. 599 (1) (44 SE 320) (1903); *Phoenix Ins. Co. v. Clay,* 101 Ga. 331, 332 (28 SE 853) (1897); *Kaiser v. Pedrick,* 30 Ga. App. 642 (118 SE 790) (1923); *Mutual Life Ins. Co. v. Durden,* 9 Ga. App. 797, 800 (72 SE 295) (1911).