[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 4, 2012
JOHN LEY
CLERK

No. 11-14495
Non-Argument Calendar
_____

D.C. Docket No. 5:11-cv-00073-MTT

WILLIAM J. BECHAM, JR.,

Plaintiff-Counter Defendant-Appellee,

CROSSLINK ORTHOPAEDICS, LLC,

Counter Defendant-Appellee,

versus

SYNTHES USA,
SYNTHES SPINE COMPANY LP,
NORIAN CORPORATION,
SYNTHES MAXILLOFACIAL INC.,
SYNTHES SPINE INC.,
SYNTHES NORTH AMERICA INC.,

Defendants-Appellants,

SYNTHES USA, LLC,
SYNTHES USA PRODUCTS, LLC,
SYNTHES USA SALES, LLC,

Counter Claimants-Appellants.

---

Appeal from the United States District Court
for the Middle District of Georgia

---

(June 4, 2012)

Before CARNES, WILSON, and COX, Circuit Judges.

PER CURIAM:

The Defendants (collectively "Synthes") appeal the district court's grant of summary judgment to Plaintiff William J. Becham, Jr. The court concluded that each of the restrictive covenants in Becham's employment contract was unenforceable under Georgia law. We reach the same conclusion albeit for different reasons. Thus, we affirm.

## I. FACTS

A. Georgia's Law on Restrictive Covenants

Georgia's law on restrictive covenants is central to the issues raised by Synthes. We discuss this law first.

Before 2011, Georgia law disfavored restrictive covenants. *See Convergys Corp. v. Kenner*, 582 S.E.2d 84, 85–86 (Ga. 2003). Georgia's constitution also forbade the state's legislature, the General Assembly, from authorizing restrictive covenants. *See Jackson & Coker, Inc. v. Hart*, 405 S.E.2d 253, 254 (Ga. 1991).

But, the law can change. In 2009, the General Assembly approved HR 178, which placed a constitutional amendment on the November 2010 ballot. This amendment granted the General Assembly the power "to authorize and provide by general law for judicial enforcement of contracts or agreements restricting or regulating [certain] competitive activities . . . ." H.R. Res. 178, 150th Gen. Assemb., Reg. Sess. (Ga. 2009). Perhaps due to oversight, the General Assembly omitted an effective date for this amendment.

Anticipating that Georgia's citizens would approve the constitutional amendment, the General Assembly enacted HB 173. *See* 2009-1 Ga. Code Ann. Adv. Legis. Serv. 145 (LexisNexis). This act purported to authorize previously unlawful restrictive covenants. For example, HB 173 permitted courts to reform overly broad restrictive covenants so that they could be enforced. *See* Ga. Code Ann. § 13-8-54(b) (repealed 2011). HB 173 also deemed the duration of certain covenants to be presumptively reasonable. *See* Ga. Code Ann. § 13-8-56 (repealed 2011).

Because the General Assembly did not yet have the power to enact HB 173, it made the act's effective date contingent upon ratification of the constitutional amendment. Specifically, HB 173 said it would become effective the day after Georgia's citizens ratified the amendment. 2009-1 Ga. Code Ann. Adv. Legis. Serv.

3

162 (LexisNexis).  HB 173 also specified that it "shall apply to contracts entered into on and after [its effective date]." *Id.*

On November 2, 2010, Georgia's citizens approved the constitutional amendment.  But, because the amendment lacked an effective date, it did not immediately go into effect.  Instead, pursuant to the Georgia constitution, the amendment became effective on January 1, 2011.  HB 173, on the other hand,  went into effect the next day—November 3, 2010.

The General Assembly was concerned about the gap in the effective date of HB 173 and the constitutional amendment. *See* 2011-2 Ga. Code Ann. Adv. Legis. Serv. 136 (LexisNexis).  During the 2011 legislative session, it passed HB 30, which repealed HB 173 and then substantially reenacted its provisions with only a few changes.  The governor signed HB 30 into law on May 11, 2011, and it became effective that same day.  However, HB 30 said it applied "to contracts entered into on and after [its effective date] and [that it] shall not apply in actions determining the enforceability of restrictive covenants entered into before such date." *Id.* at 147.

4

B. Becham's Employment with Synthes[1]

Becham began working for Synthes in 2000. He sold medical and bone implant devices to hospitals and healthcare providers in and around Macon, Georgia. When Becham started work for Synthes, he signed an employment contract. That contract included four restrictive covenants: (1) a noncompete covenant; (2) a nonsolicitation-of-customers covenant; (3) a nonsolicitation-of-employees covenant; and (4) a nondisclosure covenant. We refer to these agreements as "the Restrictive Covenants."

The noncompete covenant provided:

> I agree I will not, for a period of one year after my employment terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of Synthes in the territory or territories that I am now, or have been responsible for at any time during the last year of my employment with Synthes.

(Dkt. 1-1 at 3.) A competitor means "any persons or entities who . . . sell . . . orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device or instrumentation technologies, products, or services." (*Id.*)

The nonsolicitation-of-customers covenant provided:

> I will not, for a period of one year after my employment with Synthes terminates for any reason, solicit or contact, directly or through others,

---

[1] Because we are reviewing a motion for summary judgment, we state the facts in the light most favorable to Synthes.

for the purpose of competing or interfering with any part of Synthes' business, (1) any customer of Synthes that I solicited at any time during the last three years of my employment; (2) any prospective customer of Synthes that received or requested a proposal or offer from me on behalf of Synthes at any time during the last three years of my employment; or (3) any customer or prospective customer of Synthes for which I had any responsibility, directly or indirectly, at any time during the last three years of my employment.

(*Id.*)

The nonsolicitation-of-employees covenant provided:

I will not, for a period of one year after my employment with Synthes terminates, directly or indirectly solicit any employee of Synthes to leave their employment with Synthes, offer any employee of Synthes employment elsewhere, or hire any employee of Synthes to work elsewhere.

(*Id.*)

The nondisclosure covenant provided:

At all times during and after my employment with Synthes, I will not disclose or communicate any [proprietary] information to any competitor or other third party, or use or refer to any of this information for any purpose . . . .

(Dkt. 1-1 at 2.) Propriety information includes: (1) the identity of customers; (2) the prices and terms of customer contracts; (3) marketing and sales strategies; and (4) certain other nonpublic financial and business information. The nondisclosure covenant applies to Becham in perpetuity.

6

In November 2010, Becham decided to leave Synthes at the end of the year. He told his manager about his decision, and his manager emailed Becham the terms of his separation. Relevant here, Synthes promised to compensate Becham until the end of the year and to pay him $20,521.28 in commissions on January 15, 2011. In exchange, Synthes asked Becham to honor the Restrictive Covenants. Becham emailed his acceptance of Synthes's terms on December 1, 2010.

But, Synthes did not pay Becham his commissions on January 15. Instead, the parties continued in negotiations, and Becham, allegedly, made a new promise to honor the Restrictive Covenants in January 2011. Synthes eventually paid Becham the $20,521.28 in commissions on January 31.

Less than a month later, Becham filed this suit. He sought a declaration that the Restrictive Covenants are unenforceable. The next week, Becham started work for Synthes's competitor CrossLink Orthopaedics, LLC. Becham then moved for summary judgment on his claims. In September 2011, the district court decided that Georgia's law governs the Restrictive Covenants, and that these covenants are unenforceable. It granted summary judgment to Becham. Following final judgment, Synthes appeals.

## II. DISCUSSION

"We review a grant of summary judgment *de novo*, applying the same legal standards that bind the district court." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1222–23 (11th Cir. 2004) (citation omitted). "[A] federal court sitting in diversity will apply the choice of law rules for the state in which it sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941)).

In this case, the district court was bound to apply Georgia's choice-of-law rules. We can affirm on any basis supported by the record. *United States v. $121,100.00 in U.S. Currency*, 999 F.2d 1503, 1507 (11th Cir. 1993) (citation omitted).

Synthes first contends that the district court applied the wrong law. The district court applied Georgia law. Becham's employment contract chooses Pennsylvania law. A choice-of-law clause is generally enforceable in Georgia. *See Carr v. Kupfer*, 296 S.E.2d 560, 562 (Ga. 1982). But, a Georgia court will not enforce a choice-of-law provision when the application of foreign law would violate Georgia's public policy. *See Nasco, Inc. v. Gimbert*, 238 S.E.2d 368, 369 (Ga. 1977)

Before November 2010, Georgia's public policy on restrictive covenants was clear. Georgia's courts refused to enforce a choice-of-law clause when it would

validate a restrictive covenant that was invalid under Georgia law. *See, e.g.*, *Convergys Corp.*, 582 S.E.2d at 85–86. Synthes contends that Georgia's public policy shifted in November 2010 to support the broad enforcement of restrictive covenants. It argues that the district court erred by not considering Georgia's new public policy.

In November 2010, Georgia did two things that could have changed its public policy on restrictive covenants. First, Georgia's citizens ratified a constitutional amendment granting the General Assembly the power to enact legislation concerning restrictive covenants. Second, HB 173, which purported to authorize the enforcement of previously unenforceable restrictive covenants, went into effect. We conclude neither of these events altered Georgia's public policy on restrictive covenants.[2]

First, the November 2010 constitutional amendment did not change Georgia's public policy on restrictive covenants. The text of that amendment says nothing about Georgia's public policy. Rather the amendment addresses the power of

---

[2] Synthes urges us to look to the "prevailing social and moral attitudes" of Georgia's citizens to find the state's public policy on restrictive covenants. *See Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 713 (11th Cir. 1985). We cannot do that. In Georgia, "[c]onstitutions and statutes are declarations of public policy . . . [and are] the sources that are first to be considered and *that often may be conclusive*" in determining that public policy. *See Strickland v. Gulf Life Ins. Co.*, 242 S.E.2d 148, 151 (Ga. 1978) (emphasis added) (quotation omitted). Regarding the enforcement of restrictive covenants, Georgia's General Assembly has clearly said that "[a]ny restrictive covenant not in compliance with [Georgia law] is unlawful and is void and unenforceable." Ga. Code Ann. § 13-8-53(d) (repealed and reenacted 2011). Under *Strickland*, this statutory directive is a conclusive statement of Georgia's public policy.

9

Georgia's General Assembly to legislate. It grants the General Assembly the power "to authorize and provide by general law for judicial enforcement of contracts or agreements restricting or regulating [certain] competitive activities . . . ." H.R. Res. 178, 150th Gen. Assemb., Reg. Sess. (Ga. 2009). Because the amendment addressed only the power of the General Assembly, it did not affect Georgia's public policy on restrictive covenants. *See Foster v. Brown*, 34 S.E.2d 530, 534-35 (Ga. 1945). Until the General Assembly acted, Georgia's public policy remained unchanged. *See id.*

Of course, the General Assembly did act to change Georgia's public policy. It anticipated that Georgia's voters would approve the constitutional amendment and enacted HB 173. This act directs Georgia's courts to enforce many previously unlawful restrictive covenants. To the extent that the restrictive covenants are enforceable under HB 173, the application of Pennsylvania law would not offend Georgia's public policy.

The district court treated HB 173 as if it became effective on January 1, 2011—the same day the constitutional amendment became effective. The district court also concluded that HB 173 did not apply retroactively. But, that is not exactly right. By its terms, HB 173 became effective on, and applies to all contracts entered on or after, "the day following the ratification at the time of the 2010 general election

10

of an amendment to the Constitution of Georgia." 2009-1 Ga. Code Ann. Adv. Legis. Serv. 162 (LexisNexis). That day was November 3, 2010. Because Becham promised to abide by the Restrictive Covenants on December 1, 2010, HB 173 applies to these agreements.

It is clear that the Restrictive Covenants would be at least partially enforceable under HB 173.[3] Becham does not argue to the contrary. Instead, he contends that HB 173 is unconstitutional and void. We agree.

HB 173 was approved by the legislature in 2009 and became effective on November 3, 2010. In Georgia, a statute's constitutionality is tested at the time it was passed. *See Comm'rs of Roads & Revenues of Fulton Cnty. v. Davis*, 102 S.E.2d 180, 182–83 (Ga. 1958).[4] On November 3, 2010, Georgia's constitution prohibited the General Assembly from enacting any legislation authorizing the enforcement of

---

[3] HB 173 permits the modification of a "a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties." Ga. Code Ann. § 11-8-53(d) (repealed 2011). The act directs Georgia's courts to "construe a restrictive covenant to comport with the reasonable intent and expectations of the parties . . . and in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." Ga. Code Ann. § 13-8-54(a) (repealed 2011). The act further permits the courts to modify an otherwise unenforceable restrictive covenant to "grant only the relief reasonably necessary to protect such interest or interests and to achieve the original intent of the contracting parties to the extent possible." Ga. Code Ann. § 13-8-54(b) (repealed 2011).

[4] We note that *Commissioners of Roads & Revenues of Fulton County v. Davis*, 102 S.E.2d 180 (Ga. 1958), and *Jones v. McCaskill*, 37 S.E. 724 (Ga. 1900), may require us to test HB 173's constitutionality at the time the legislature approved that act rather than the date it became effective. We need not resolve this state law question because HB 173 is unconstitutional at either time.

11

restrictive covenants. *See Jackson & Coker, Inc.*, 405 S.E.2d at 254–55. As such, HB 173 was unconstitutional and void the moment it went into effect. *Davis*, 102 S.E.2d at 183.

The constitutional amendment authorizing HB 173 went into effect on January 1, 2011. This event did not revive HB 173. In Georgia, the only way to "revive" an unconstitutional statute is to reenact that statute. *See id.* (citing *Grayson-Robinson Stores, Inc. v. Oneida, Ltd.*, 75 S.E.2d 161, 164 (Ga. 1953)). The General Assembly did substantially reenact HB 173 after the constitutional amendment went into effect. It passed HB 30, which became law on May 11, 2011. But HB 30 does not apply "in actions determining the enforceability of restrictive covenants entered into before" May 11, 2011. 2011-2 Ga. Code Ann. Adv. Legis. Serv. 147 (LexisNexis). Thus, HB 30 does not apply to the Restrictive Covenants.

Because HB 173 is unconstitutional, the General Assembly did not act to change Georgia's public policy on restrictive covenants. Therefore, the district court did not err in applying Georgia law.

Synthes next contends the district court resolved material issues of fact in favor of Becham. It contends that a material issue of fact exists about whether or not Becham promised to abide by the Restrictive Covenants in January 2011. This argument assumes that Georgia's public policy on restrictive covenants changed on

12

January 1, 2011. Because we conclude that Georgia's public policy did not change until May 2011, this argument fails.[5]

Finally, Synthes contends that, even if Georgia's public policy did not change, the district court erred in its application of "old" Georgia law. We disagree. The reasonableness of a restrictive covenant is generally a question of law for the court. *See Orkin Exterminating Co. v. Walker*, 307 S.E.2d 914, 916 (Ga. 1983). Each of the restrictive covenants in this case is unreasonable as a matter of law and, therefore, void and unenforceable.

First, the noncompete covenant fails because it contains "a territorial limitation not determinable until the time of the employee's termination." *Jarrett v. Hamilton*, 346 S.E.2d 875, 877 (Ga. Ct. App. 1986); *see Orkin Exterminating v. Pelfrey*, 227 S.E.2d 251, 252 (Ga. 1976) ("[T]he provisions of an employment contract which allow the employer to assign the employee to any territory it desires with the restrictive covenants following the employee is too indefinite to be enforced."). Becham's noncompete covenant covers "the territory or territories that [he] was] . . . responsible for during the last year of [his] employment with Synthes."

_____

[5] Sythnes contends that the district court resolved two other disputed facts in favor of Becham. First, the district court concluded that Becham's assigned territory was Macon, Georgia. (Dkt. 36 at 11 n.5, 13 n.9.) Second, it concluded that Becham was not the "heart and soul" of Synthes's business. (Dkt. 36 at 13.) Even if we assume the district court improperly resolved these issues, the Restrictive Covenants would still be unenforceable under Georgia law for the reasons discussed below.

13

(Dkt. 1-1 at 3.) Becham could not know, until his termination, where he was prohibited from working. Therefore, the covenant is too indefinite to be enforced. *See Jarrett*, 346 S.E.2d at 877; *Durham v. Stand-By Labor of Georgia, Inc.*, 198 S.E.2d 145, 149 (Ga. 1973). Because the noncompete covenant fails, the nonsolicitation-of-customers covenant also fails. *See Ward v. Process Control Corp.*, 277 S.E.2d 671, 673 (Ga. 1981) (citation omitted).

Similarly, the nonsolicitation-of-employees covenant fails because it lacks any territorial limitation. This covenant forbids Becham from soliciting any Synthes employee anywhere in the world. Thus, it is unreasonable and unenforceable. *See MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) (citing *Hulcher Servs., Inc. v. R.J. Corman R.R. Co., L.L.C.*, 543 S.E.2d 461, 467 (Ga. Ct. App. 2000).

Finally, the nondisclosure covenant fails because it did not contain a time limitation. *See Howard Schultz & Assoc. v. Broniec*, 236 S.E.2d 265, 270 (Ga. 1977) (citation omitted); *U3S Corp. of Am. v. Parker*, 414 S.E.2d 513, 517 (Ga. Ct. App. 1991).

Therefore, the district court did not err when it concluded the Restrictive Covenants are void and unenforceable under "old" Georgia law.

## III. CONCLUSION

Because Synthes has not shown reversible error, we affirm the judgment of the district court.

AFFIRMED.