## RELIANCE INSURANCE COMPANY *v.* Ralph D. KINMAN

5-5964                                   483 S.W. 2d 166

### Opinion delivered July 17, 1972

*Rose, Barron, Nash, Williamson, Carroll & Clay,* for appellant.

*McMath, Leatherman & Woods,* for appellees.

Frank Holt, Justice. Appellee suffered the loss of a foot in an accident. He was insured by the appellant to cover such a contingency. The appellant refused to pay the claim on the basis that appellee's foot was not actually severed within the time limitation of 180 days. The trial court, sitting as a jury, found for the appellee and awarded $50,000, the full amount of the policy, plus a 12% statutory penalty, and an attorney's fee. From that judgment comes this appeal.

For reversal the appellant contends that the "trial court erred in holding that the actual severance of appel-

lee's leg occurred on the day of the accident rather than 18 months later when appellee's leg was actually severed from his body;" that the "trial court erred in holding that the injury suffered by [appellee] on December 6, 1967 entitled him to recover under the provisions of the insurance policy" issued by appellant; and, further, that the "trial court erred by failing to give effect to the plain wording of the insurance policy." In other words, it is appellant's contention that the trial court erred in interpreting the language of the insurance policy issued by appellant to appellee. We consolidate these contentions for discussion.

The pertinent provision of the insurance policy provides that in the event of the "loss" of a foot within 180 days following the date of the accidental injury, the appellant would pay $50,000 for the loss of the foot. The policy, also, provides that "'loss' as above used shall mean, with reference to hand or foot, actual severance through or above the wrist or ankle joint. . . . " The trial court found that the appellee-insured sustained a loss on December 6, 1967, at which time his left leg was substantially severed; and, further, that the amputation of his leg by a physician on June 9, 1969, was evidence of the severance that occurred on the date of the injury. As previously indicated the appellant asserts that the trial court was in error. The appellee, however, contends there is substantial evidence to support the court's finding that the loss of appellee's foot occurred on the day of the accident, inasmuch as appellee's foot was substantially, or for all practical purposes, "severed at or above the ankle" on the day of the accident and the subsequent amputation was only evidence of the severance. Therefore, appellee is permitted to recover under the terms of the appellant's policy.

Appellee suffered extensive bodily injuries in an automobile accident. These injuries consisted of a fractured mandible, a shattered left arm, fractured ribs, and a mangled left leg from which a 6" piece of the femur, a large leg bone, was completely separated. This piece was found in a ditch and taped to a splint when appellee

was brought to the hospital. The leg muscles, tendons, deep, or major, veins were torn apart and the leg was connected to the body only by the sciatic nerve, and artery, some muscle tissue and skin. The wound was grossly contaminated with mud, sand, grass, blood and bits of clothing. Upon admission to the hospital, appellee suffered a heart attack; and the doctor thought he was dead. However, the doctor finally restored the heart beat. Other complications attended his injuries. The doctor did not then amputate his leg for fear that it would cause his death. Another episode occurred which could be termed as a cardiac arrest. His entire blood supply was completely replaced twice upon initial admission and several times during his four months initial hospitalization.

The treating doctor implanted the separated femur and reassembled the parts of appellee's leg, nailing the bones back together, suturing the muscle tissues, ligaments, and skin in an effort to save the leg. He testified that he had never seen a segment of bone as large as this 6" femur be reestablished and regenerated. However, he felt it advisable to try to salvage the leg, with appellant's approval, hoping it would not become infected or other complications occur. The usual reason for amputating a leg is due to inadequate blood or nerve supply or both. Normal color and temperature never returned to appellee's leg. There was no strength in it and for all purposes he had no motor control of his foot during the period of treatment. These symptoms indicated the need of amputation, and they existed from the time of the injury.

The doctor further testified that it would take a year-and-a-half or two years for a fragment of bone as large as the one separated from appellee's leg to eventually revitalize or regenerate, or perhaps longer if the healing process was handicapped by infection. Also, approximately a year-and-a-half is required for the sciatic nerve to heal as it, too, has slow regenerative powers.

On June 9, 1969, or about 18 months following the

injury, being unable to control a severe infection, the doctor amputated appellee's leg. The doctor testified that "medically, in retrospect, it was lost from the time of the initial injury. The reason we tried to retain it was hoping that the body had the power to regenerate the necessary components of this leg in order to salvage it. It did not. Therefore, we amputated it. . . . Medically, my opinion is that the leg was an untenable situation from the very onset, but that's only in retrospect. Obviously, I tried to attempt to save it."

The doctor further testified that "the leg was swollen and discolored, but as far as medical severance or amputation, it is what we would call an almost complete amputation or a near amputation and anything that was done was an attempt to salvage the leg." Because of appellee's weakened physical condition, it was medically inadvisable to amputate appellee's leg; although he probably could have withstood the operation after about two weeks, but by this time a kidney complication existed. Efforts thereafter were directed toward the possible salvage of the leg, keeping in mind that barring infection it would take a year-and-a-half or two years to determine whether the effort would be successful. He testified that although he reimplanted the severed femur, it continued to exist "as a dead bone" and that it "never revitalized." Although some sensation did return, the leg was red and cold at times, never had an adequate blood supply, or normal temperature and "for all intents and purposes" he had no motor control of his foot. As previously stated, the doctor was of the opinion that "[M] edically, in retrospect, it was lost from the time of the initial injury."

The appellee, himself, testified that he never regained the use of his leg or had any motor control of it. Also, that following the accident he never had any feeling or sensation in his leg and that the color of his leg was never again normal. A witness, who accompanied appellee to the hospital, testified that appellee had a blood transfusion in route and before he left the scene of the accident and it appeared to him that only skin held the appellee's leg onto his body.

When we review the evidence on appeal, as we must do, in the light most favorable to the appellee, there is substantial evidence to support the trial court's finding that "under the terms of the policy, the loss occurred on December 6, 1967, and severance of the leg occurred on that date and that the amputation that occurred on June 9, 1969, was evidence of the severance that occurred on the prior date." In *Westenhover* v. *Life & Casualty Inc., Co. of Tenn.*, La. app. 27 So. 2d 391 (1946), the insurance company refused payment to the insured on the basis that the actual amputation of the leg occurred after the expiration of the 30 day period of limitation. The insurance company relied upon the policy provision that "[N]o sum shall be payable for the loss of any member except for total and permanent severance at or above the ankle. . . . No payment will be made hereunder unless. . . . loss of the member, . . . occurs within thirty days from the date of the accident." It was contended by the insured that this provision did not make payment dependent upon amputation or the total and permanent severance of his leg within thirty days of the date of the injury. To the contrary, the insurance company construed the term "loss" and "total and permanent severance" as being synonymous. In affirming a judgment for the insured and rejecting the contention of the insurer, the court said:

"The provision of the policy at issue does not restrict the meaning of the *loss* of a member to amputation. It simply restricts liability for payment for the loss of a member to those cases in which such loss has been evidenced by amputation. Nor does the policy require that amputation, total and permanent severance, take place within thirty days, but simply that the *loss* of the member shall occur within thirty days from the date of the accident. . . .

"The insured, under the terms of the policy under examination, cannot be penalized simply because his physicians attempted to prevent the necessity for amputation of his leg. The leg was 'lost' from and after the accident, therefore the requirement for the occurrence of loss within the thirty-day period was

fully met, and the fact that the amputation was made sometime after the expiration of this period if of no importance. . . .

"It appears plain to us that the loss of plaintiff's leg followed as the immediate result of the accident. The fact that severance of the member by amputation did not take place until more than two months later is beside the point."

In *Interstate Life & Accident Company* v. *Waters,* 213 Miss. 265, 56 So. 2d 493 (1952), the doctor postponed amputation of the insured's leg for three months because of his physical condition. There the insurer contended that unless the loss the leg occurred within 30 days after the accident there was no liability under the policy. The insurer asserted that the words "loss of the member" in its policy meant "loss by severance" within thirty days from the date of the accident. The policy provided: "In every case referred to in this policy the loss of any member shall include only the loss by severance at or above the ankle or wrist joints." In affirming a judgment for the insured, the court approved and applied the reasoning and logic *Westenhover, supra*; also, the court quoted with approval from 44 C.J.S., Insurance, § 296, page 1163:

"A contract of insurance should be given a fair and reasonable construction and likewise, should be given a sensible construction, consonant with the apparent object and plain intention of the parties; a construction such as would be given the contract by an ordinary intelligent business man; and a practical and reasonable rather than a literal interpretation. The contract should not be given a strained, forced, unnatural, or unreasonable construction, or a construction which would extend or restrict the policy beyond what is fairly within its terms, or which would lead to an absurd conclusion, or render the policy nonsensical and ineffective."

In *Huff* v. *Vulcan Life and Accident Insurance Company,* 281 Ala. 615, 206 So. 2d 861 (1968), the insured was

sawing a tree when accidentally the saw cut the muscles and bone of an arm leaving only a part of the skin to connect the two portions of the arm. The doctor tried to salvage the arm sufficiencly to secure a "flesh hook" use of it which would serve better than a "metal hook." The blood supply to the hand and a portion of the arm were restored; however, the insured could not move any fingers of his hand and had no feeling in any of his fingers except a slight sensation in one. The injured part of the arm did not unite and consequently it became necessary to amputate the lower forearm and hand more than 90 days (the time limitation) after the date of the accident. The issue was whether the insured had suffered a "loss" of his hand by "severance" on the date of the injury. The trial court directed a verdict for the insurer. In reversing, the Supreme Court of Alabama said:

> "It will be noted that the only reason given by the learned trial judge for giving the charge was his construction of the word 'severance' as 'an entire separation' or a complete severance from the body or the upper arm. We agree that Webster's New International Dictionary defines 'sever,' inter alia, as meaning 'disunite,' 'dissociate,' 'to open,' 'to cut or break open or apart.' But there is not the finality in every definition of the word severance as there is to the word 'amputation.'"

The court cited with approval *Westenhover, supra,* and *Waters, supra.* See, also, *Sneck v. Travellers' Ins. Co. of Hartford, Conn.,* 88 Hun. 94, 34 N.Y. Supp. 545 (1895), and *Beber v. Brotherhood of Railroad Trainmen,* 75 Neb. 183, 106 N.W. 168 (1905).

In the latter case, the insurer contended that since the insured had a thumb and finger on an injured hand and a partially stiffened wrist joint that this did not constitute a physical separation as a wrist joint within the terms of the policy. The Supreme Court of Nebraska said:

> "Now, the question to be determined is, what did the defendant company contract to insure against under the provisions of this by-law? Was it the severance

of the entire loss of the use of the hand at or above the wrist joint? or was it the entire loss of the use of the hand at or above the wrist joint by physical separation? If the only risk assumed by defendant was the amputation of the whole hand, then the learned trial court was fully justified in directing a verdict for defendant; but, if a fair and liberal interpretation of the contract most favorable to the insured can make it a risk which includes the total loss of the use of the hand by severance, then the question as to whether such loss is established by the evidence is properly one for the triers of such facts."

The court then held that it was a question of fact whether there was a total loss of use of the insured's hand at or above the wrist joint, constituting a permanent separation within the terms of the policy.

The Supreme Court of Oregon in *Moore* v. *Aetna Life Ins. Co.,* 75 Or. 47, 146 Pac. 151 (1915), aptly quoted:

"As indicated in the last authority cited, the attempts of the insurance companies to avoid this construction by so changing the policy that it reads, 'loss by severance of feet or hands,' has failed; the courts holding as before, that it is the loss of the use of the member which was the object of the contract."

See, also, *Crawford* v. *Lloyds London,* 275 Cal. App. 2d 524, 80 Cal. Reptr. 70 (1969).

In the case at bar, there was evidence that the leg was mangled; 6" of the femur was separated from the leg and found in a ditch; the deep veins in the leg were torn off; the femoral vein was ruptured; in addition to a fragment of bone being "evulsed," there was "evulsed" some of the soft tissue, muscle, skin and subcutaneous fat; the nerve supply was destroyed; a failure of motor control resulted with a permanent loss of normal temperature and color from an inadequate blood supply. The doctor testified that although he hoped for a miracle in trying to salvage the leg, in retrospect, medically "it was lost from the time of the initial injury" and that severance to him

meant that the leg had lost its ability to regenerate. Although the appellee's foot was not surgically amputated until June 9, 1969, we reiterate, there is substantial evidence to support the finding of the trial court that appellee's leg was actually severed at the time of the injury, resulting in the loss of its use.

As we understand the policy, the "loss" had to occur within 180 days and "loss" was defined as "actual severance." A reasonable and sensible construction of the policy is that the insured sought insurance against the loss of his foot as a useful member of his body. Obviously, the additional safeguard which required "actual severance through or above the ankle joint" is to prevent fraudulent claims. In the case at bar, the appellee has lost the use of his leg by actual severance above the ankle joint. The ambiguity of the language used becomes apparent and discernible if the doctor was able to graft successfully the leg. Even though the language of the policy appears exact, we doubt appellant would have agreed to pay for the loss occasioned by a complete bodily severance followed by a successful graft of the leg. With logic, appellant could assert that there was no loss of use since the limb is restored to the body. The same logic should apply in reverse in construction of the policy as to intent of the parties; namely, that appellant shouldn't be allowed to assert that the limb was not completely severed from the body when all that occurred after the injury was the pain willingly endured by the appellee during the time the doctor hoped to achieve a miracle. Had the miracle occurred certainly the appellant would have contended there was no liability.

The use of the policy term "actual severance" is clearly ambiguous. It may, as demonstrated above, be interpreted to mean "physical severance" in one instance and "functional severance" in another whichever appears to be most beneficial to appellant. Given such an ambiguity, it is axiomatic that the provision should be construed in favor of the insured since the appellant wrote the policy and selected its own terminology. This litigation may well be the result of policy language which

was drafted long in advance of modern and more recent medical technology and skills.

In *Huff* v. *Vulcan Life and Accident Insurance Co.,* *supra,* it was said:

> "To force an insured to have a member amputated within a specific number of days in order to be indemnified for his loss, when his doctors are doing their best to save the member or a part of it is neither reasonable nor sensible to us, when it is clearly the *loss* and not a specified time of amputation that is covered by the policy."

We are in accord with this rationale.

In our view the leg was "lost" from and after the injury. The requirement that the "loss" occurred from "actual severance" was fully met by the evidence when viewed most favorably to the appellee. The fact that the surgical amputation was made sometime after the period of time in which the loss occurred does not destroy or eliminate the policy coverage.

Appellant, also, contends for reversal that the trial court's award of $10,000 as attorney fees is shockingly excessive. This is approximately 20% of the amount of the judgment, which included the statutory penalty. This appears to be a case of first impression in our jurisdiction; and in the circumstances, we cannot say that the award is excessive. However, this fee is adequate for both trial and appeal services.

Affirmed.

GEORGE ROSE SMITH and FOGLEMAN, JJ., dissent.