James J. REID, Appellee,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA, INC., a corporation, Appellant.

No. 82–1757.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1983.

Decided Oct. 12, 1983.

mobiles in transit," 456 U.S. at 806, 102 S.Ct. at 2163.

Thomas C. Salane, Columbia, S.C. (Turner, Padget, Graham & Laney, Columbia, S.C., on brief), for appellant.

Michael Parham, Greenville, S.C. (Andrew L. Abrams, Abrams, Bowen & Parham, Greenville, S.C., on brief), for appellee.

Before RUSSELL, WIDENER and CHAPMAN, Circuit Judges.

WIDENER, Circuit Judge:

James Reid brought this diversity action against the Life Insurance Company of North America to recover benefits under a policy of accident insurance. The policy provides benefits for accidental "loss of one member," which is defined as a "hand, foot or eye." The policy defines "loss" as "actual severance through or above the wrist or ankle joints...." The district court held the policy term "actual severance" to be ambiguous, and liberally construed the language to cover what it found to be Reid's functional loss of a leg after he underwent surgery for the implantation of a Bateman hip prosthesis. Because we believe that Reid did not suffer an "actual severance" within the meaning of the policy, we reverse.

On October 5, 1980, James Reid was helping a friend shore up a deck, which had partially fallen away from the house to which it was attached. Reid raised the deck with an automobile jack and cut some

lumber to serve as supports. While lying on his right side and wedging the lumber between a cement pad and the deck, Reid suddenly experienced a popping sensation in his right hip, as he twisted around. He immediately felt pain and a burning sensation. A piece of the right femur had flaked off and passed into the hip joint, restricting the operation of the joint.

Reid had experienced problems with both hips before the incident of October 5. As early as June 1975, Reid visited an orthopedic surgeon, Dr. James Green. Dr. Green diagnosed Reid's condition as a wasting away of the cartilage of the hip joint, which he treated with anti-inflammatory drugs. Reid also consulted with Dr. Lesley Myer, who told him that X-ray pictures showed a narrowing of the right hip joint.

In April 1976, Reid saw another orthopedic surgeon, Dr. B. Freeman, who diagnosed Reid as suffering from arthritic degeneration of the hips. The degeneration was progressive and irreversible. His right hip was worse, and Dr. Freeman told him that he had lost fifty percent of the joint space in the hip, but that with some care the hip might last ten to fifteen years.

Dr. Freeman treated Reid with cortisone injections into both hip joints. Reid's condition improved for awhile, but then became increasingly worse. In October 1977, Dr. Freeman told Reid that he would definitely need reconstructive surgery on both hips. Dr. Freeman recommended that Reid make each hip last as long as possible before undergoing surgical replacement of the heads of the femurs. On April 12, 1978, Reid saw Dr. Freeman again and complained of increasing pain and decreasing range of motion in both hips, with more restriction in the right than in the left hip. Dr. Freeman told Reid that he "will undoubtedly ultimately require total hip joint replacement, probably of both hips." By December 1979, Reid had lost almost all rotary motion in his right hip and was in pain whenever he moved. If he labored for a living and were it not for his sedentary employment as a member of the South Carolina Industrial Commission, Reid stated he would have been totally incapacitated by pain and stiffness in his hip at that time.

After the incident on October 5, 1980, Reid had to use crutches for a couple of weeks. He saw Dr. Freeman on October 20, at which time he was scheduled for reconstructive surgery, which took place on February 4, 1981.

The surgical procedure involved an incision through the buttock. The surgeons exposed and dislocated the hip joint, and then cut off the head and part of the neck of the femur, which they replaced with a prosthesis. The femur and prosthesis were then replaced in the hip, and the incision was closed.

While immediately after the incident of October 5 the impairment of Reid's right leg was total, after the surgery his condition substantially improved. Most of the time, Reid can walk unassisted. He does, however, use a cane about one third of the time, and sometimes he needs crutches. Reid's leg "gives out" unpredictably when he feels pain and weakness in his hip and thigh. He can walk only on level ground for short distances, and he cannot stand for more than fifteen minutes without difficulty. Although he has occasional numbness in his toes, he has no sensory loss in his leg, and he has a full range of motion in his right ankle. He has no problem driving his car, which his job requires.

The district court found that Reid's injury resulted from an accident, directly and independently of all other causes, including arthritis. The district court further found that Reid suffered a severance of the leg, resulting in a complete functional loss of the right leg and foot, and gave judgment for Reid in the amount specified in the policy for "loss of one member."

■ In this diversity case, we apply the substantive law of the forum, South Carolina. *Erie RR Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1487 (1938).

■ Under the law of South Carolina, insurance policies are subject to the general rules of contract construction. *Sloan Constr. Co. v. Central Nat'l Ins. Co. of*

*Omaha,* 269 S.C. 183, 236 S.E.2d 818, 819 (1977). We must enforce, not write, contracts of insurance; and we must give policy language its "plain, ordinary, and popular meaning." *Id.* We should not torture the meaning of policy language in order to extend coverage that was never intended by the parties. *Torrington Co. v. Aetna Casualty & Sur. Co.,* 264 S.C. 636, 216 S.E.2d 547, 500 (1975).

■ If policy language is ambiguous, it should be construed liberally in favor of the insured. *Torrington,* 216 S.E.2d at 550. If the policy language is not ambiguous, again, we must construe it "according to the plain, ordinary meaning" of its words. *Deese v. American Bankers Life Assur. Co. of Florida,* 263 S.C. 160, 208 S.E.2d 736, 737 (1974).

■ Neither party has pointed to any South Carolina authority construing the term "actual severance," and none has come to our attention. In the absence of South Carolina authority, we must decide the case as we think the highest court of South Carolina would if confronted with the same situation. See *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Hatfield v. Palles,* 537 F.2d 1245 (4th Cir.1976). In deciding a question of first impression, the decisions of courts of other jurisdictions are persuasive authority in South Carolina. *Shepherd v. United States Fidelity & Guar. Co.,* 233 S.C. 536, 106 S.E.2d 381, 383 (1958).

In turning to the decisions from other jurisdictions, we find three basic categories of cases. The first category of cases involves policy language that provides for benefits upon "loss" of a member, without any requirement that the loss take place in a certain manner. Courts of other jurisdictions have generally construed such "loss" so as to include "loss of use of the member." They have thus refused to read "loss" strictly to require an actual physical separation of the member from the body. E.g., *Business Men's Mut. v. Lockhart,* 291 S.W. 658, 660 (Tex.Civ.App.1927) ("loss" as used in a policy includes "any injury which renders the member useless"); *Lord v. Ameri-*

*can Mut. Accident Ass'n,* 89 Wis. 19, 61 N.W. 293, 294 (1894) (question of fact for jury whether "loss" of a hand included actual loss of three fingers, part of another, and destruction of the thumb joint).

A second category of cases in this area of law involves accident policies that insure against "loss" of a member and define the "loss" in terms such as "loss ... by severance at or above ..." or simply as "severance" or "amputation." Most courts that have faced such policy language have concluded it clearly and unambiguously required dismemberment. In *Eminent Household of Columbian Woodmen v. Hancock,* 174 S.W. 657 (Tex.Civ.App.1915), for example, the insured suffered a complete paralysis of his arm after a large muscle and a motor nerve were cut. The Court held that no ambiguity existed and that the insured did not suffer a "loss of one arm by severance at or above the wrist...." *Id.* at 658. The policy language clearly required severance from the body. *Id.* Similarly, in *Brittain v. Prudential Ins. Co.,* 29 Ala.App. 57, 191 So. 794, *cert. denied,* 238 Ala. 445, 191 So. 800 (1939), the court held that the removal of cartilage and ligament from the insured's knee by surgery, without which the knee would not function, rendering the leg permanently useless, was not a "loss ... by severance at or above ... the ankle." 191 So. at 796–797. Concluding that the policy language was unambiguous, the court enforced the policy limitation. 191 So. at 800. See also to like effect: *Muse v. Metropolitan Life Ins. Co.,* 193 La. 605, 192 So. 72, 73–74 (1939); *Metropolitan Casualty Ins. Co. v. Shelby,* 116 Miss. 278, 76 So. 839, 839–40 (1917); *Wiest v. United States Health & Accident Ins. Co.,* 186 Mo. App. 22, 171 S.W. 570, 571–72. Also within this second category are cases in which courts have had to construe policy language that provides benefits for the "amputation or severance ... at or above the wrist joint." The general response to such language has been to hold that it clearly and unambiguously requires an actual cutting off of the member at the place indicated. E.g. *Brotherhood of RR Trainmen v. Wil-*

*kins,* 257 Ky. 331, 78 S.W.2d 6, 9 (1935); *Brotherhood of R.R. Trainmen v. Walsh,* 89 Ohio St. 15, 103 N.E. 759, 760 (1913).

Within this second category of cases, however, a minority rule has evolved that allows for recovery of benefits when the insured demonstrates "substantial severance." For example, in *King v. Metropolitan Life Ins. Co.,* 20 Tenn.App. 246, 97 S.W.2d 651 (1936), the insured cut his hand off with a rip saw, except for a small band of tissue which the saw did not cut. A surgeon was able to reattach the limb, but the hand atrophied and became useless. The court held that the insured could come under the terms of the policy, which required "loss ... by severance," if he could show a substantial severance. *Id.* The court reasoned that the term "by severance" indicates the cause of the disability, and that the extent of disability should have been left to the jury. See also *Morgan v. The Prudential Ins. Co. of Am.,* 86 Wash.2d 432, 545 P.2d 1193, 1194–96 (1979) (en banc) (holding that "loss by severance" was ambiguous and that a substantial severance could satisfy a policy when there was functional loss as if the limb had been severed completely from the body).

The third category, generally comprising the more recent cases, involves policy language similar to that in issue here, "actual severance through or above the wrist or ankle joints ...." Counsel for Life Insurance Company of North America takes the position that this language represents the insurance industry's response to the minority rule that allows recovery of benefits for substantial severance when the policy stipulates that the loss be by "severance."

Most of the courts that have passed on the requirement that "loss" be by "actual severance," have found the phrase unambiguous and have construed the language literally. E.g., *Traverse v. World Services Life Ins. Co.,* 436 F.Supp. 810, 811–12 (W.D. Okl.1977); *Boyes v. Continental Insurance Co.,* 139 Ga.App. 609, 229 S.E.2d 75, 77 (1976).[1]

In one case, however, "actual severance" has been held to be ambiguous because it could mean physical severance or functional severance. In *Reliance Ins. Co. v. Kinman,* 252 Ark. 1168, 483 S.W.2d 166 (1972), the insured suffered a severe injury to his leg in an automobile accident. The leg was badly mangled and remained connected to his body only by some nerves, blood vessels, and muscle and skin tissue. A six inch piece of the femur broke off and was found in a nearby ditch. *Id.* at 167. The insured's physicians did not amputate immediately because of medical complications. Instead, they tried without success to graft the six inch piece of femur back to the remaining bone. Over a year later, well after the policy's requirement that the loss occur within 180 days of accidental injury, the insured underwent surgical amputation of his leg. *Id.* The trial court had found that the "actual severance" occurred on the date of the accident because all the medical evidence showed that the attempt to save the leg was futile from the outset. *Id.* Assuming that the insured would lose his claim if the graft had taken, the Supreme Court of Arkansas affirmed because it would have been unfair to make the insured undergo amputation at the risk of his life and before his physicians had tried their best to save the leg. *Id.* at 171. In holding that the same policy language as was present in *Kinman* is ambiguous, and in construing it in favor of the insured, the district court

---

1. The same language has been held to be unambiguous in the context of spinal cord damage that leaves the insured without the use of his arms or legs. E.g. *Juhlin v. Life Ins. Co. of North America,* 301 N.W.2d 59, 61 (Minn.1980) (denying recovery); *Sitzman v. John Hancock Mutual Life Ins. Co.,* 268 Or. 625, 522 P.2d 872, 875 (1974) (en banc) (denying recovery); *Murray v. Insurance Co. of North America,* 490 S.W.2d 250, 252 (Tex.Civ.App.1973) (denying recovery). In *Galindo v. Guarantee Trust Life Ins. Co.,* 91 Ill.App.3d 61, 46 Ill.Dec. 543, 414 N.E.2d 265 (1980), the court did not reach the issue whether a broken neck and spinal cord were an actual severance. The court found the policy unclear as to whether it required such an actual severance for the insured to recover for a "loss" under the policy. The court construed the policy as not requiring an "actual severance" for the insured to have suffered a "loss", and held that the insured suffered a "loss" within the meaning of the policy.

placed great weight on the *Kinman* decision.

After consideration of the development of this body of insurance law, we are of opinion the Supreme Court of South Carolina would align itself with the substantial majority of jurisdictions that have regarded the policy language at issue here as clear and unambiguous. In this respect, we especially note that what are apparently identical policies have been construed to be unambiguous in the *Murray* and *Juhlin* cases, supra. The phrase "actual severance" appears to be fairly new language, replacing the less restrictive language of "loss" or merely "severance" used in earlier policies. As such the new language evidences an intent to limit coverage. See *Deese v. American Bankers Life Assur. Co. of Florida,* 263 S.C. 160, 208 S.E.2d 736, 737 (1974).

We think the district court erred in its reliance on the *Kinman* case and in its construction of the language of the policy at hand as being ambiguous. We are of opinion that the phrase "actual severance" is not ambiguous. We find it unnecessary to express an opinion on the correctness of the result in *Kinman* and like cases in strained factual situations not present here. Whatever the result may have been if Reid's hip had been violently injured and an immediate amputation had been avoided only through medical necessity, as in *Kinman,* is not persuasive here. Neither are cases such as *King,* supra, in which a hand which was all but severed by a saw managed to retain life when sewed back on but was functionally useless. Whatever the limits of the coverage under the phrase "actual severance" may be, we are of opinion they do not include the replacement of the head of the femur with a Bateman prosthesis. "Actual severance" describes neither the manner nor the extent of Reid's loss, and the plain, ordinary meaning of the policy does not permit such a construction. The leg was not severed from the body, and there was no permanent severance of muscle, nerves, blood vessels, lymph vessels, skin or other connective tissue. The severance of the head of the femur in order that it be replaced with the prosthetic device took place during reconstructive surgery which successfully attempted to improve Reid's condition brought on in part by the incident of October 5, 1980. The Bateman prosthesis is well seated in a good position, and Reid's condition has been improved as a result of its use.

Because of the construction we have placed on the insurance policy, we do not reach the other questions raised by the parties.

The judgment of the district court is accordingly

REVERSED.