John B. WALPOLE and Theodora W. Walpole, John B. Walpole, Jr., and William E. Walpole, d/b/a Sunny Point Farms, Plaintiffs,

v.

GREAT AMERICAN INSURANCE COMPANIES and American National Fire Insurance Company, Defendants.

Civ. A. No. 2:92–2434–18.

United States District Court,
D. South Carolina,
Charleston Division.

Aug. 29, 1994.

Gerald M. Finkel, Columbia, SC, Charles S. Altman, Charleston, SC, Gilbert S. Bagnell, Charleston, SC, for plaintiffs.

Carol B. Ervin, Charleston, SC, John H. Smith, Charleston, SC, Richard B. Ness, Bamberg, SC, for defendants.

### ORDER

NORTON, District Judge.

This matter is before the court upon Defendants' renewed Motion for Summary Judgment, pursuant to Fed.R.Civ.P. 56. Summary Judgment Motions were filed by all parties and argued before the court on February 4, 1994. The court issued its order, filed on March 16, 1994, denying the Cross–Motions for Summary Judgment. Subsequently, Defendants renewed their Summary Judgment Motion at a status conference before the court on June 24, 1994. The court thereafter invited counsel to submit memoranda regarding their respective positions as to paragraph 6.c.(1)(d)(iii) of the insurance policy, the so-called "catch-all" provision which Defendants contend requires that all marketed tomatoes count against the farmer irrespective of whether the insurance period has ended or not.

Specifically, the court is asked to review policy language previously argued but not discussed in its order filed on March 16, 1994, denying Summary Judgment Motions. Defendants assert the insurance language, section 6.c.(1)(d)(iii), is dispositive of the "salvage" versus "harvest" issue. Plaintiffs claim their tomato picking after July 2, 1992, was a "salvage." Defendants assert whether Plaintiffs' picking of tomatoes after July 2, 1992, is a "harvest" or a "salvage" makes absolutely no difference, and that the cessation of the insurance period has absolutely no bearing on how the harvested production should be determined.

### I. BACKGROUND

This is a declaratory judgment action, arising from the partial loss of Plaintiffs' 1992 tomato crop due to adverse weather. Plaintiffs seek a declaration of the indemnity due, claiming far greater indemnity was due than was paid. Not surprisingly, the main dispute is over the construction of an insurance policy.

Plaintiffs operate a large farming operation known as Sunny Point Farms (hereinafter "Sunny Point") where they grow fresh market tomatoes. Defendant American National Fire Insurance Company (hereinafter "American National" or "Insurer") is a division of Defendant Great American Insurance Companies (hereinafter "Great American").

Plaintiffs purchased a multiple peril crop insurance policy from American National to insure Plaintiffs' tomato crop from loss due to various adverse weather conditions. The Federal Crop Insurance Corporation (herein-

after "FCIC"), an entity of the federal government, reinsures the policy at issue.[1]

During the 1992 policy year, Plaintiffs experienced an early frost loss and the tomato crop was replanted. Because of continuing adverse weather conditions, the new crop again failed. Around July 1, 1992, a major storm occurred which knocked down a great number of the tomato plants, snapped the poles which held them up and damaged the tomatoes. This event caused Plaintiffs to call American National.

Agents of American National came to the Sunny Point farm on July 2 or 3, 1992, and met with John Walpole. The parties agree that they had a discussion as to the meaning of the policy at issue. There is a dispute among the parties as to what was said and as to what was done following this visit from the American National agents.[2]

As of July 2, 1992, Plaintiffs had acres of storm damaged tomato plants with broken down stakes. John Walpole picked the weather damaged tomatoes. Plaintiffs sold all tomatoes that they picked.[3]

## II. SUMMARY JUDGMENT STANDARD

▉▉▉ To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, this court must view the record in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir. 1990). The judge is not to weigh the evidence himself but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

▉▉▉ The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

> The non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.' [Cite omitted]. 'The mere existence of a scintilla of evidence in support of [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party].' [Cite omitted].

*Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992). *See also Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) ("Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes"). However, "[w]here states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie." *Overstreet v. Kentucky Central Life Ins. Co.,* 950 F.2d 931 (4th Cir.1991).

## III. ANALYSIS

In its previous order, this court stated:

1. There are two types of crop insurance policies authorized and governed by the Federal Crop Insurance Act. The first is a policy issued directly by the FCIC. The second type is issued by private insurance companies, with language approved by the FCIC, and reinsured by the FCIC. Although their provisions are similar, the two policies need not be, and are not, identical. Plaintiffs in the case at bar purchased a policy of the latter type. The policy at issue is a guaranteed production plan policy.

2. Because the rights of the parties under the policy are determined by the policy rather than their opinions about the policy, the content of this discussion is irrelevant to the question of coverage.

3. This case only involves tomatoes that were picked and sold or, in the words of the policy language, harvested production that was marketed. This declaratory judgment action is therefore concerned with the construction of the language that appears in the Special Provisions of the insurance policy at para. 6.c.(2)(a).

Before resolving the policy construction issue in this declaratory judgment action, the question of whether this case involves a "salvage" of a totally destroyed tomato crop or whether this case involves a "harvest" of a damaged tomato crop must be resolved. The court cannot, as a matter of law, resolve this issue. "[T]here ... [are] genuine issue[s] as to ... material fact[s]" regarding this question. Fed.R.Civ.P. 56(c). The determination of whether there was a "salvage" or a "harvest" is a prerequisite to the determination of when the insurance policy period ended; and, in turn, a determination of which policy provision applies to the case at bar.

Order, p. 5.

Defendants have asserted that this court erred in its prior ruling. Defendants assert that paragraph 6.c.(1)(d)(iii) of the Multiple Peril Crop Insurance Special Provisions, Fresh Market Tomatoes—Production Plan (hereinafter "Special Provisions") is dispositive of this case, rendering summary judgment in their favor. Paragraph 6.c.(1)(d)(iii) states:

### 6. CLAIM FOR INDEMNITY

\* \* \* \* \* \*

c. The total production to be counted will be cartons from insurable acreage for the farm unit and will include all appraised and harvested production.

(1) Appraised production will include:

\* \* \* \* \* \*

(d) potential production of unharvested acreage for which we have given consent to put to another use. The indemnity for the farm unit may be determined without regard to such appraisal when such acreage is:

\* \* \* \* \* \*

(iii) harvested ....

Special Provisions, p. 2 of 4 (para. 6.c.(1)(d)(iii)). This matter has been thoroughly briefed and is ready for a ruling from this court. As seen below, this court agrees with Defendants that paragraph 6.c.(1)(d)(iii)

of the policy's Special Provisions should have been discussed in its previous order and that paragraph 6.c.(1)(d)(iii) is dispositive of this case.

### A. Catch–All Provision—Special Provisions, Paragraph 6.c.(1)(d)(iii)

In the policy's Special Provisions, the insurance period is defined pursuant to provision 1 as follows, in pertinent part:

Insurance on insurable acreage on a per acre basis will attach at the time the tomatoes are planted and will cease upon the earliest of:

\* \* \* \* \* \*

b. discontinuance of harvest;

\* \* \* \* \* \*

e. the date harvest is completed;

f. the date the insured tomato crop is destroyed, as determined by us; ....

Special Provisions, p. 1 of 4 (para. 1.b.,e. & f.).

Items 1.b. and 1.e. allow for the insurance period to end at the discontinuance of harvest or upon completion of harvest. Defendants assert harvest continued for a number of weeks after the July 2 storm. Plaintiffs deny that they "harvested" tomatoes after the storm, but agree that after the post-storm tomatoes were "salvaged" they were sold at market.

Provision 1.f. appears to be the provision relied on by Plaintiffs in this action. Plaintiffs take the position that their crop was destroyed on July 2, 1992. Plaintiffs argue that the policy should have terminated according to its terms on that date, thereby rendering them due compensation for their total loss as it occurred on July 2, 1992.[4] Plaintiffs argue that their recovery would have been unaffected either by the costs of subsequent cleanup or any proceeds they might have realized through "salvage" operations as they cleared their lost crop from the fields. Throughout this case, Defendants have argued that no appraisal was required or appropriate at the time that the adjusters

---

**4.** Plaintiffs apparently take the position that if *they* determine the crop to be destroyed, the policy terminates. Plaintiffs fail to acknowledge

the clear language of para. 1.f.—"as determined by us." Pursuant to the policy, Defendants determine when a crop is destroyed.

visited the Sunny Point farm on July 2 or 3, 1992. Defendants have stated that they could not appraise or adjust the loss until the insurance ceased and the insurance could not cease where Mr. Walpole continued to "harvest" his damaged, but not destroyed, tomato crop. The court, in its prior order, declined to award summary judgment to either Plaintiffs or Defendants based on the dispute as to the characterization of Mr. Walpole's continued picking after the storm—"salvage vs. harvest."

Defendants assert that the prior reasoning of this court, the "salvage vs. harvest" issue raised in the prior order, does not involve a genuine or material issue precluding summary judgment because the policy provides a "catch-all" provision which requires that all marketed tomatoes count against the farmer whether the insurance period has ended or not. Paragraph 6.a. provides as follows:

> You must establish the total production of tomatoes on the farm unit and any loss of production that has been directly caused by one or more of the insured causes during the insurance period for the crop year for which the indemnity is claimed.

Special Provisions, p. 2 of 4 (para. 6.a.). Paragraph 6.c. provides:

> The total production to be counted will be cartons from insurable acreage for the farm unit and will include all appraised and harvested production.

*Id.* (para. 6.c.). Paragraph 6.c.(1)(d)(iii) provides:

> The indemnity for the farm unit may be determined without regard to such appraisal when such acreage is ... harvested.

*Id.* (para. 6.c.(1)(d)(iii)).

■ Harvested production includes all tomato production marketed, regardless of the date picked or sold. Since the court finds no ambiguity in the definition of "harvested production,"[5] all tomato production marketed should be counted as harvested production.

Thus, the present issue before the court on this renewal of summary judgment is whether provision 6.c.(1)(d)(iii) requires all tomatoes, regardless of when picked, to be counted as harvested production, not just those tomatoes picked prior to July 2, 1992.

Defendants contend that if the insurance period ended due to any reason, an appraisal would have been conducted. If a discontinuance of harvest had been announced, or if the harvest had been completed, or if the insurer deemed the crop destroyed, Defendants contend that the insurance period would have ended, and an appraisal would then have been required since no more tomatoes would have been picked.

The adjusters for American National went to the farm soon after the storm. The farm was inspected by the adjusters. Mr. Walpole thereafter decided that he would continue picking the tomatoes. This picking, no matter if defined as a "salvage" or a "harvest," in and of itself, precluded a determination of total destruction.

Under the terms of the policy, whether the insured crop is totally destroyed is for the insurance company to determine. *See* Special Provisions, p. 1 of 4 (para. 1.f.). The farmer had the option, at the time of the discussions with the adjusters, to discontinue harvest. If Defendants deemed the crop destroyed or the farmer ceased harvest, the insurance period would have ended. Neither occurred.

In the Multiple Peril Crop Insurance General Provisions (hereinafter "General Provisions"), para. 5.d. provides the policy requirements which must be complied with after crop damage. That provision states:

> Without delay give us notice in the event that any farm unit is damaged to the extent that you do not expect to further care for the crop; do not intend to harvest any

---

**5.** *See infra* pp. 1288–1291 (discussion on the construction of the insurance policy). In its prior order, this court stated:

> [S]hould Defendants be found correct in their assertions as to which policy provisions apply, the court ... believes that it will be difficult to conclude that the ... policy provision defining "harvested production" is ambiguous.

Order, p. 8 n. 7. The court now concludes that the policy provision defining "harvested production" is clear and unambiguous and explains its reasoning later in this order.

or all of the crop; or wish to put the acreage to other use.

General Provisions, p. 2 of 3 (para. 5.d.).

The record shows that no notice that the farm unit was damaged to the extent that the crop would not be further cared for, or that Plaintiffs did not intend to harvest any or all of the crop, was ever communicated to Defendants. Therefore, no appraisal was conducted.

Regardless of the content of the discussions between the adjusters and Mr. Walpole, the parties' actions show that no insurance period ending actions occurred, and no appraisal was necessary or appropriate until harvest was complete. *See id.* The adjusters did not declare that the crop was destroyed when they visited the farm. This is evident from the fact that they did not order an appraisal of the crop at this time. Mr. Walpole continued to pick tomatoes after the date of his meeting with the adjusters. Had the insurance period ended, the appraisal would have been conducted pursuant to Special Provision 6.c.(1). This provision sets forth the applicable appraisal factors. Defendants argue that paragraph 6.c.(1)(d)(iii) would be activated if an appraisal had been necessary and the farmer had decided to further harvest (or "salvage") after the insurance period had ceased, even if an appraisal had been conducted. In other words, if any further tomatoes had been picked and sold after the end of the insurance period, the appraisal would be disregarded, and the sales would then be counted as harvested production. Defendants argue that to calculate the claim otherwise would be inequitable and contrary to the plain language of the policy. This court agrees. Whether the crop was "destroyed" or not, whether it was appraised or not, all tomatoes picked and sold from the 1992 crop, at *any* time, must count as harvested production under 6.c.(1)(d)(iii).

To construe 6.c.(1)(d)(iii), the court must consider the meaning of the language and why it was placed in the policy. It permits the indemnity on a farm to be determined without using or applying an appraisal in the event such acreage (farm unit) is later picked. In essence, there would be no need for an appraisal if the acreage is actually harvested, because the "potential production" is not harvested production. That is precisely what happened in this case. If the harvest is not stopped, no appraisal is needed to determine production left in the field. Instead, production is determined by what was harvested. If harvest is stopped, an appraisal would be needed to determined what is left in the fields. If that production is then picked, it is "harvested." The drafters of the regulations and policy never included the word "salvage" in any of its documents. This court concludes that under the policy at issue tomatoes picked and marketed, even after an alleged total destruction, must be included in harvested production.[6]

## B. Construction of Policy Language

This declaratory judgment action is over the construction of the policy purchased by Plaintiffs. The pertinent language in dispute appears in the Special Provisions portion under the heading "Claim For Indemnity" and states:

> The total production to be counted will be cartons from insurable acreage for the

---

6. The parties were directed to submit supporting case law for their positions. Apparently, there is none to be found for either view, except administrative decisions which provide some guidance to the court. Defendants submit the case of *Joe Todd Farms*. Although the *Joe Todd Farms* case involves an administrative appeal and is not binding on this court, it is instructive on the FCIC's interpretation of harvested production and how tomatoes sold should be counted, even if the tomatoes are considered "salvage."

In the *Joe Todd Farms* administrative appeal, there were approximately 10,000 boxes of tomatoes which apparently did not meet grade to be sold as fresh market tomatoes but were of sufficient quality that allowed them to be sold by the farmer to a cannery for a minimal price. Though the tomatoes were sold as "salvage" for 31 cents per box, the FCIC required them to be counted as production at $3.00 per box because they were sold, even though they were sold as post-destruction "salvage." The policy in the *Joe Todd Farms* case was a dollar plan policy which is different from the Guaranteed Production Plan in the case at bar; however, for the issues being discussed, Defendants argue, and this court agrees, that the policies are similar.

farm unit and will include all appraised and harvested production.

Special Provisions, p. 2 of 4 (para. 6.c.).

Harvested production will include:

(a) **all tomato production marketed;** and

(b) any harvested **unmarketed** production meeting the standards for grading 85 percent or better U.S. No. 1's with classification size of 6 × 7 (2–8/32 inch minimum diameter) or larger.

*Id.* (para. 6.c.(2)(a) & (b)) (emphasis added).

Plaintiffs claim they are entitled to their guaranteed production level, less only those marketed tomatoes meeting the standard eighty-five (85) percent or better U.S. No. 1 tomatoes. Defendants contend that Plaintiffs' indemnity must be offset by *all market-ed* production, regardless of grade. Defendants assert that they have paid Plaintiffs their entire indemnity due under that construction of the policy.[7] Plaintiffs seek a declaration of the indemnity due from this court, claiming far greater indemnity was due than was paid.

### 1. Meaning of "Marketed"

■ The words in the policy, when not defined therein, must be given their plain ordinary meaning. "Market" is defined in Webster's Dictionary as "to buy or sell." WEBSTER'S NEW WORLD DICTIONARY 828 (3d Edition 1988).[8] Plaintiffs' tomatoes were sold. They were, therefore, marketed. Once any tomatoes were sold, those tomatoes became production to count against the production guarantee under the clear, unambiguous provisions of the policy, as further explained below.

### 2. Policy Construction

As to the proper construction of the policy, Defendants set forth their position as follows:

The language of the policy issued clearly provides for marketed and harvested but unmarketed production to count in two distinct clauses. The *unmarketed* harvest to count is qualified by the standard of eighty-five (85%) percent U.S. Grade 1 or better. The *marketed* production is not so qualified. Harvested and marketed production includes *all* tomatoes sold, regardless of grade. The rationale behind the distinction is that a farmer ought not have his indemnity offset by tomatoes which are altogether unmarketable. By the same rationale, he ought not profit by insurance proceeds if he also profits by selling his crop. Where the crop is marketable but of a lower grade, whether to sell the tomatoes for a commensurate lower price or simply accept insurance proceeds with an offset for appraised production left in the field is a decision for the farmer to make as a businessman. Plaintiffs decided to harvest and sell all the tomatoes they could, having been fully advised the policy required all tomatoes sold to be counted against the indemnity.

Defendant's Memorandum in Support of Motion for Summary Judgment, p. 4 (filed August 9, 1993).

■ This court agrees with Defendants' position as set forth above. The Crop Insurance Act is remedial legislation. It is intended only to insure a farmer's investment, not his profits. *Mann v. FCIC,* 710 F.2d 144, 147 (4th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984) (farmer's indemnity must be offset by entire value of peanuts produced, including amount grained by storing production for a time). Plaintiffs agree that the insurance policy at issue is intended only to insure Plaintiffs' investment, not their profits.[9] All of Plaintiffs' marketed production must be counted under the plain language of the policy. There is no further indemnity due Plaintiffs.

---

**7.** Defendants calculated the gross indemnity due Plaintiffs to be $156,000.00, less unpaid premiums, with a net indemnity due of $108,000.00. Defendants have paid Plaintiffs this net sum of $108,000.00.

**8.** *See also* BLACK'S LAW DICTIONARY 500 (5th Ed.1983) (includes the phrase "purchase and sale" in its definition of "market").

**9.** Plaintiffs' counsel agreed with this statement at the hearing before this court held on February 4, 1994.

Defendants properly calculated and rendered the indemnity due Plaintiffs.[10]

Plaintiffs claim that the adjusters for Defendants instructed them to harvest and implied that the harvest would not offset against the indemnity. Besides being irrelevant where there is clear and unambiguous policy language, *see infra* p. 1290, this assertion is also contrary to the April 20, 1993 deposition testimony of John Walpole. In his deposition, John Walpole, a Plaintiff in this action, as well as the head of Plaintiffs' farming operations, testified in his April 20, 1993 deposition: "And I think the big issue was whether I—what should I do; should I continue harvesting, or should I just send everybody back home." John Walpole Deposition, p. 69 (lines 18–20). When asked if the adjuster told him what his options were, he said, "No, he didn't." *Id.* at p. 73 (line 23). While the adjusters were present on the farm reviewing the damage, it was clear to all present that there was a dispute as to the coverage provided by the policy, according to Mr. Walpole's testimony. *Id.* at p. 77 (line 19)–78 (line 6) & p. 78 (lines 17–23). Mr. Walpole further testified that the adjuster commented he knew Mr. Walpole would harvest the crop. *Id.* at p. 79 (lines 3–4). In response, Mr. Walpole said, "I didn't plant that crop … for insurance coverage, I'm a farmer and I know what I've got to do, I've got to salvage, I got to do the best I can." *Id.* (lines 4–7). To this, he testified the adjuster responded, "You just go on and pick … and we'll come back with the checkbook." *Id.* (lines 7–9). Mr. Walpole responded, "I know—I disagree, with you, … I'm just saying I read it differently than you and we'll have to worry about that later." *Id.* (lines 10–12). This testimony shows that there was apparently a dispute among the parties at

the farm that day regarding policy language as to which tomatoes would count against indemnity due and that Mr. Walpole continued to harvest in the face of Defendants' view that there would be an offset for *all marketed* tomatoes, regardless of grade.

Mr. Walpole further testified that he had information from another farmer in his area that the same policy interpretation had been conveyed to that farmer as to the offset for *all marketed* tomatoes, regardless of grade. *Id.* at p. 80 (line 24)–81 (line 24). This testimony of John Walpole, who is the only Plaintiff or witness for Plaintiffs who was present for all of every meeting with the adjusters, is consistent with Defendants' position that he was not instructed to harvest and was told that there would be an offset for *all marketed* tomatoes, regardless of grade.

■ Even if the adjusters had made the statements as claimed by Plaintiffs, i.e. told Plaintiffs to go ahead and harvest and they would be back with the checkbook,[11] Defendants' adjuster's statements cannot be applied to extend coverage where there is none because the doctrine of estoppel cannot extend coverage beyond that authorized by the policy. *Mann,* 710 F.2d at 147 (FCIC agents mistakenly told farmer bonus would not count and the court found that "[a]n agent of the FCIC could not extend crop insurance where there was none because the doctrine of estoppel cannot extend the coverage beyond that authorized by Congress and the rules promulgated by the FCIC."). "The farmer is charged with knowledge of the … policy. . . ." *Id.* Plaintiffs cannot rely on estoppel principles to expand the coverage provided by the policy.[12]

---

**10.** *See* Dennis Strickland Affidavit (explains the method of calculating the indemnity due in this claim, pursuant to what this court finds to be clear, unambiguous policy provisions).

**11.** This court notes that Defendants' agents' comment that "they would be back with the checkbook" was apparently not a misleading statement. Defendants have paid Plaintiffs $108,000.00, presumably by check.

**12.** In *FCIC v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), plaintiffs reseeded 400 of their 460 acre wheat crop and advised agents of

the FCIC of that fact. The agents informed them the entire crop was insurable. After most of the crop was destroyed, their claim was denied, based on the reseeding. (The agents had not mentioned the reseeding on the application). The Court noted the hardship of the case, but held that where federal crop insurance is involved and the FCIC will pay the loss, the representations of the agents cannot expand the coverage and estop the insurer. The Court noted that federal crop insurance is not just another form of insurance but a government remedial program whose costs are borne by the federal treasury. For that reason, the insured must be charged

Plaintiffs' claims as to the method of calculating indemnity are directly contrary to the language of the policy purchased by them. Plaintiffs cannot rely on the representations of others as to the policy's contents. An insured has a duty to read the policy he purchases and to abide by its plain terms. There is no ambiguity requiring construction. The plain language is available to the court and is easily discernible. "[C]ourts should not torture the meaning of the policy to extend coverage not intended by the parties." *Allstate Ins. Co. v. Best,* 728 F.Supp. 1263, 1266 (D.S.C.1990). Where the policy language for calculating a loss is clear and unambiguous, it must be given its "plain, ordinary, and popular meaning." *Reid v. Life Ins. Co. of North America,* 718 F.2d 677, 680 (4th Cir.1983).[13] The method of calculating as provided by the policy is the method that must be used. All Plaintiffs' *marketed* production was properly included in production to count as an offset to the indemnity due.

Lastly, Plaintiffs cite an internal FCIC appeal case from Maryland, *Butler Farms,* to assert that the policy language is ambiguous. Apparently, there was some dispute as to the proper reading of an FCIC issued insurance policy in that case. Plaintiffs assert that the dispute in that case shows that the policy is ambiguous. The court, however, does not agree with Plaintiffs' argument. Like *Joe Todd Farms, Butler Farms* has no precedential affect on this court and, it is interesting to note, that the result in that case supports Defendants' construction of the policy—that *all marketed* production must be counted as an offset against indemnity. Furthermore, the policy in this action is clearer than the FCIC issued policy, in that its punc-

tuation clearly indicates that marketed production is not qualified by any grading standard.[14] The plain language of the policy at issue must prevail.

## IV. CONCLUSION

Summary judgment is proper under Fed. R.Civ.P. 56 where there remains no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. 317, 106 S.Ct. at 2549. Summary judgment is appropriate in the case at bar. The plain language of the policy provides that all Plaintiffs' *marketed* tomatoes, regardless of grade or the date of picking, must be counted as production to offset against indemnity due. Any instructions or representations made by Defendants, if any were made, cannot vary the clear terms of the policy. Plaintiffs are entitled to their guaranty level, less *all marketed* production They have already been indemnified to that extent. It is therefore,

ORDERED, that Defendants' Motion for Summary Judgment be GRANTED.

AND IT IS SO ORDERED.

---

with notice of the regulations and policy provisions, which will not be disregarded.

The court finds that the *Merrill* and *Mann* holdings are equally applicable to FCIC reinsured policies, as well as FCIC directly issued policies.

**13.** This rule is consistent with United States District Judge Traxler's order in *Knight v. American Nat'l Fire Ins. Co.,* 831 F.Supp. 1284 (D.S.C. 1993) (unpublished order).

**14.** The FCIC policy is not punctuated like the policy issued to Plaintiffs. In Plaintiffs' policy, the semicolon [;] between subsections (a) and (b) of the definition of "harvested production" indicates a clear intention to separate the two phrases. Special Provisions, p. 2 of 4 (para. 6.c.(2)). This separation by the semicolon supports this court's finding that the language is unambiguous and that only subsection (b) is qualified by the grading standards. *Id.*