**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 30, 2023**

# In the Court of Appeals of Georgia

A23A0369. MULLALLY et al. v. CU CAPITAL MARKET SOLUTIONS, LLC et al.

PIPKIN, Judge.

William T. Mullally (individually "Mullally"), along with various limited liability companies that he has formed or wholly owns (collectively "Appellants"),[1] appeals the determination that the restrictive covenants found in the operating agreement of Appellee CU Capital Market Solutions, LLC ("CMS"),[2] are valid and enforceable against him. As we explain below, we affirm the judgment of the trial.

---

[1] Other Appellants include the following: Community Lending Partners, LLC; Mullally Capital Management, LLC; Peachtree Loan Consultants, LLC; and Southern Comfort Partners, LLC.

[2] Other Appellees include Capital Markets Management Group, LLC; CU Funding Company, LLC; CU Funding Company Manager, LLC; Lewis N. Lester, Sr., individually and d/b/a Office of Supervisory Jurisdiction; Robert Colvin; Jefferson Financial Credit Union; and Freedom Northwest Credit Union.

1. This appeal follows the partial grant of summary judgment.[3] "Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." (Citations omitted.) *McRae v. Hogan*, 317 Ga. App. 813, 815 (1) (732 SE2d 853) (2012).

Mullally, Lewis N. Lester, Sr., and Robert Colvin formed CMS to provide consulting services to federal and state chartered credit unions, including loan participation opportunities. The CMS operating agreement was executed in May 2016, with each of the three men – Mullally, Lester, and Colvin – holding approximately one-third of the total Class A Units of the business.[4] Regarding the membership units, Section 8.2 of the Operating Agreement provides that each of the Members "agrees not to . . . (c) withdraw or attempt to withdraw from the Company . . . without the unanimous consent of the Members." Additionally, Sections 9.1 and 9.3 of the agreement prohibit Members from transferring their units in any way

---

[3] OCGA § 9-11-56 (h) authorizes a direct appeal from "[a]n order granting summary judgment on any issue or as to any party[.]"

[4] Under the operating agreement, "Class A Units are voting units."

2

without the written unanimous consent of all members and that, without such consent, any purported transfer would be "deemed invalid, null and void, and of no force or effect."

In addition to restricting the transfer of membership units, the Operating Agreement also included various restrictive covenants, including a non-compete and non-solicitation clause. The non-complete clause, found in Section 13.2, precludes a member from engaging in "competitive business" while that member "holds any [u]nits and for a period of two years after . . .ceas[ing] to hold any [u]nit." Similarly, the non-solicitation clause in Section 13.3 provides, in relevant part, that a member, while "hold[ing] units and for a period of three years thereafter," is prohibited from soliciting or attempting to provide services to any person who was a client or prospective client within the three years prior to the member ceasing to hold units.

Mullally was employed by CMS for several years, "where he [led] all business development initiatives and manage[d] the loan participation desk." In late January 2020, after years of declining revenues and after becoming dissatisfied with the business, Mullally resigned from CMS, but he expressly retained his membership units. Approximately two weeks later, CMS sent a cease and desist letter to Mullally, reminding him of the restrictive covenants, demanding that he cease providing

3

services to CMS clients, and advising him that he needed to account for revenue earned as a consequence of his work. Just days later, Appellants filed a two-count complaint seeking a declaration that the restrictive covenants were void and unenforceable against Mullally and his various companies.

Appellees subsequently answered and counterclaimed, seeking, as relevant here, both injunctive relief and monetary damages arising out of Mullally's alleged breach of the CMS operating agreement, including the restrictive covenants. Following extensive discovery – as well as the addition or dismissal of various claims and parties that are unrelated to this appeal – the parties filed cross-motions for summary judgment as to Appellants' claim for declaratory relief; Appellants also moved for summary judgment on Appellees' claims for injunctive and monetary relief arising out of Mullally's alleged breach of the restrictive covenants, arguing that the restrictions were unenforceable as a matter of law or, alternatively, unenforceable against him.

Following a lengthy hearing, the trial court entered an order on the pending motions for summary judgment. As relevant here, the trial court decided that the restrictive covenants in the operating agreement were controlled by Georgia's Restrictive Covenants Act ("the GRCA"), OCGA § 13-8-50 et seq., rather than by

4

common law as Mullally had argued; the trial court then concluded that, generally speaking, the scope of the covenants did not violate the terms of the Act, though the trial court did narrow the language of both provisions. In short, the trial court sided with Appellees, concluding that the restrictive covenants are valid and enforceable, though the trial court left the issue of any possible damages to a jury.

Now, on appeal, Appellants again claim that the GRCA does not control the restrictive covenants and, further, that the restrictive covenants here are unenforceable because they lack a definite term or duration.

2. Appellants first challenge the trial court's conclusion that the GRCA controls here, arguing, as they did below, that the restrictive covenants are instead governed by common law. We disagree.

Our analysis calls for us to delve into the GRCA, and, in so doing, we keep in mind that "we must afford the statutory text its 'plain and ordinary meaning,' we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." (Citations omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). "[F]or context, we may look to other provisions of the same statute, [and] the structure and history of the whole statute[.]"

5

(Citation and punctuation omitted.) *Thornton v. State*, 310 Ga. 460, 462 (2) (851 SE2d 564) (2020). Where the statutory text is "clear and unambiguous," we attribute to the statute its plain meaning, and our search for statutory meaning generally ends. See *Deal v. Coleman*, 294 Ga. at 173 (1) (a).

"Before 2011, Georgia law disfavored restrictive covenants. [In fact,] Georgia's constitution also forbade the state's legislature, the General Assembly, from authorizing restrictive covenants." *Becham v. Synthes USA*, 482 Fed. Appx. 387, 388 (1) (A) (11th Cir. 2012). However, following a constitutional amendment approved by Georgia voters, id. at 389 (1) (A), the General Assembly enacted the GRCA with the idea that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." OCGA § 13-8-50. As to its scope, the Act applies to contracts entered on or after May 11, 2011, see Ga. L. 2011, p. 399, §§ 4-6, and governs "contracts and agreements between or among: (1) [e]mployers and employees; (2) [d]istributors and manufacturers; (3) [l]essors and lessees; (4) [p]artnerships and partners; (5) [f]ranchisors and franchisees; (6) [s]ellers and purchasers of a business or commercial enterprise; and

6

(7) [t]wo or more employers." OCGA § 13-8-52. See also OCGA § 13-8-51 (15) (defining restrictive covenants).

As an initial matter, we can discern from the plain language of OCGA § 13-8-52 that the GRCA is not concerned with the nature or character of the contract or agreement at issue; instead, the statute focuses on the *relationship* between the contracting parties at hand. Thus, it is inconsequential that the contract here is an operating agreement or that *other* signatories may have different contractual relationships. See *Owens v. Novae, LLC*, 357 Ga. App. 240, 244 (2) (850 SE2d 457) (2020) (recognizing that the GRCA may apply to an operating agreement). Turning to the case at hand, while Appellants contend that the parties to the operating agreement do not "neatly" fall within any of the above-listed categories, we agree with Appellees that, for the purposes of the GRCA, the operating agreement may be understood as a contract or agreement between an employer and employee, at least between CMS and Mullally. Mullally has consistently and unequivocally referred to himself as an employee of CMS; indeed, he makes reference to his status as an employee of CMS in his complaint , in his resignation letter, in his motion for summary judgment , in his appellate brief, and during oral argument before this Court. While Appellants strenuously contest such a determination, they offer no

meaningful argument or authority that undermines such a conclusion. Thus, we agree with the trial court that the restrictive covenants here are governed by the GRCA.

3. Appellants next argue that the restrictive covenants are unenforceable under the GRCA because, they say, they lack a definite term or duration. We disagree.

As discussed above, the non-compete clause here precludes a member from engaging in "competitive business" while that member "holds any [u]nits and for a period of two years after . . .ceas[ing] to hold any [u]nit." Similarly, the non-solicitation clause is in force while the member is "hold[ing] units and for a period of three years thereafter." While Appellants agree that, under the circumstances present here, a restrictive covenant lasting "five years or less in duration" after the termination of the business relationship would be presumed reasonable under the GRCA, see OCGA § 13-8-57 (d), Appellants point out that the restrictive covenant here persists while the member holds units in the business and that a member may not freely divest themselves of a membership unit absent the express, unanimous consent of the members. Thus, Appellants argue, the restrictive covenants "are unreasonable and unenforceable . . . because they have a duration of indefinite length that is under the discretionary control" of the other members. We are not convinced that these restrictive covenants are ineffectual merely because the terms of the operating

8

agreement, when read as a whole, *could possibly* result in an indefinite restraint period; we reach such a conclusion for a couple of reasons.

First, the GRCA affords considerable flexibility in the creation and application of restrictive covenants. For instance, the Act does not specifically set or limit the duration of restrictive covenants; instead, OCGA § 13-8-57 simply identifies scenarios in which certain restraint periods are deemed presumptively reasonable or unreasonable. Further, the GRCA empowers the courts of this State to interpret restrictive covenants consistent "with the reasonable intent and expectations of the parties to the covenant," see OCGA § 13-8-54 (a), to modify the provisions so that they comply with the law, see OCGA §§ 13-8-53 (d) and 13-8-54 (b), and to craft remedies for the appropriate enforcement of the restrictive covenants, see OCGA § 13-8-58 (c). In short, the authority and latitude given to the courts to interpret and modify restrictive covenants so that they conform both to the will of the parties and the strictures of the GRCA rebuts any notion that an imprecise or imperfectly drafted restrictive covenant – such as the ones here – is perforce invalid.

Second, as a practical matter, the reasonableness of a restrictive covenant – at least with respect to the time element – is evaluated based on the *duration* of the

9

restraint,[5] that is, how long it *actually* lasts. See Black's Law Dictionary (11th ed. 2019) (defining the word "duration" as "[t]he length of time something lasts"). Here, the record shows that Appellants' concern about the indefiniteness of the restrictions did not materialize. Though Mullally did not attempt to divest himself of his membership units upon resignation – instead, he expressly reserved his membership units when he resigned – CMS redeemed Mullally's membership units less than six months after he resigned. The June 2020 redemption of the units triggered the definite post-termination periods in which Mullally was subject to the non-compete and non-solicitation restrictions, which, as the parties on appeal agree, were presumptively reasonable, even with the added six months.[6] As such, there is no merit to Appellants'

_____

[5] See OCGA § 13-8-56 (a) (with respect to a non-compete provision in effect during the business relationship, "a time period equal to or measured by duration of the parties' business or commercial relationship is reasonable"); OCGA § 13-8-57 (discussing the various reasonable "durations" of restraint).

[6] The trial court also determined that the pre-termination duration of the restrictive covenants was limited to and coextensive with the term of the parties' business relationship and, thus, that the restraint was enforceable. While Mullally does not expressly challenge these conclusions, they are sound. See OCGA §§ 13-8-53 (a) and (d), 13-8-54 (b), and 13-8-56 (4).

10

claim that the restrictive covenants here are void and unenforceable as a consequence of being indefinite.[7]

Accordingly, the judgment of the trial court is affirmed.[8]

*Judgment affirmed. Rickman, C. J., and Dillard, P. J., concur.*

---

[7] Given our conclusion in Division 3, we need not address Appellants' final argument as to whether the alleged indefiniteness of the restrictive covenants could be adequately modified by the trial court pursuant to OCGA § 13-8-54 (b) to comport with the GRCA.

[8] Appellants' motion to file a post-argument brief is denied as moot.

11